BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC., et al.,
Plaintiffs,

v.

Stanley K. HATHAWAY, Secretary of
the Interior, et al., Defendants.

Civ. No. 75–0113.

United States District Court,
W. D. Virginia,
Roanoke Division.

Nov. 24, 1975.

William A. Gershuny, Farmer, Shibley, McGuinn & Flood, Washington, D. C., William B. Poff, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for plaintiffs.

Rex E. Lee, Asst. Atty. Gen., Harland F. Leathers, Robert M. Rader, U. S. Dept. of Justice, I. Avrum Fingeret, U. S. Dept. of the Interior, Washington, D. C., Paul Thomson, Jr., Asst. U. S. Atty., Roanoke, Va., for defendants.

Paul R. Hoeber, Richard L. Trumka, Washington, D. C., Stuart B. Campbell, Jr., Campbell, Young & Hodges, Wytheville, Va., for intervenor-defendant.

## MEMORANDUM OPINION and ORDER

TURK, Chief Judge.

This is a suit for declaratory and injunctive relief filed by the Bituminous Coal Operators Association, a non-profit association of coal mine operators and owners (hereinafter "BCOA") against the Secretary of the Department of the Interior and the Acting Administrator and Assistant Administrator of the Mining Enforcement Safety Administration (hereinafter "MESA"). In addition, the Association of Bituminous Contractors, Inc. (hereinafter "ABC"), a voluntary association of construction companies, has intervened as a party plaintiff and the

United Mine Workers of America has intervened as a party defendant.

The issue presented by this case involves construction of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 801 *et seq.* (hereinafter "the Act"). The statutory scheme created by the Act, in pertinent part, is as follows. The Secretary of the Interior is directed to "develop, promulgate, and revise . . . improved mandatory safety standards for the protection of life and the prevention of injuries in a coal mine . . . ." 30 U.S.C. § 811(a). Mine inspectors are directed to "make frequent inspections and investigations in coal mines each year for the purpose of . . . (3) determining whether an imminent danger exists, and (4) determining whether or not there is compliance with the mandatory health or safety standard . . . ." 30 U.S.C. § 813(a). If a mine inspector finds that an imminent danger exists in an area of a coal mine, he must issue "an order requiring the operator of the mine or his agent to cause immediately all persons . . . to be withdrawn from, and to be prohibited from entering, such area . . . ." 30 U.S.C. § 814(a). If a mine inspector determines that "there has been a violation of any mandatory health or safety standard but the violation has not created an imminent danger, he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation". If the violation is not abated within the time prescribed, the inspector must issue an order "requiring the operator of such mine or his agent to cause immediately all persons . . . to be withdrawn from, and to be prohibited from entering [the affected area] . . . ." 30 U.S.C. § 814(b). If an inspector finds that there has been an "unwarrantable failure of such operator to comply with such mandatory health or safety standards" not creating an imminent danger he must include such findings in any notice given to the operator; and if within 90 days another such unwarrantable failure to comply is found he shall order the operator to cause all persons to be removed from the affected area until the violation has been abated. 30 U.S.C. § 814(c).

The Act further provides that civil penalties of up to $10,000 shall be assessed against the operators of coal mines for each violation of a mandatory health or safety standard. 30 U.S.C. § 819(a). In cases of willful violations of mandatory health or safety standards or orders issued under § 814, an operator of a coal mine may be criminally penalized for a first offense by a fine of up to $25,000 and imprisonment for a year, or both and for subsequent offenses may be fined up to $50,000 or imprisoned for 5 years, or both. 30 U.S.C. § 819(b). In cases of violations by corporate operators, the Act provides that any director, officer or agent of the corporation who knowingly authorized, ordered or carried out the violation shall be subject to the civil and criminal penalties of the Act. 30 U.S.C. § 819(d).

Succinctly stated, the issue in this case is whether MESA can enforce the Act and the regulations promulgated thereunder against coal mining companies, such as BCOA members, for violations caused by mine construction companies, such as ABC members. The controversy developed in June, 1975 when MESA announced a change in its enforcement policy as a result of the decision of the United States District Court for the District of Columbia in *Association of Bituminous Contractors, Inc. v. Morton,* Civil Action No. 1058–74 (May 23, 1975). In that case Judge Gesell issued a judgment declaring that "a coal mine construction company is not an 'operator' as defined by Section 3(d) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 802(d), where it is engaged in coal mine construction work on behalf of the owner, lessee or other person who operates, controls or supervises a coal mine". Prior to this decision MESA had construed the term "operator" to include independent contractors engaged in mine construction work and thus had enforced the Act against them directly; however,

in response to this decision the Secretary of the Interior directed MESA to issue citations to the operators of a coal mine in cases of violations created by contractors performing work for such operators.[1]

The evidence presented at the trial of this case indicated that mine construction work is a specialized branch of the construction industry and the use of such independent contractors is common in the coal mining industry. The expertise and equipment possessed by these independent contractors makes it generally more economical for mining companies to engage their services rather than to undertake the mine construction themselves. Most mining construction companies also engage in construction work which is unrelated to coal mine construction using the same personnel and equipment. During the construction of coal mines, the mining companies do not directly supervise or control the independent construction contractors or their employees. A contract administrator will usually be employed by the operator to insure that the contract is performed according to specifications, however this person does not exercise any direct supervisory control over the contractor or his employees.

Although coal mine construction does not involve the actual mining of coal, employees of these independent construction contractors often face safety hazards which are similar to those encountered by miners. This is most apparent in cases involving the construction of mine shafts and entries.[2] In addition, the evidence revealed that mine construction or repair work by independent contractors sometimes takes place while a mine is actually in operation and the employees of the contractors are exposed to identical hazards as the miners themselves. Although most mine construction work is antecedent to actual mining operations, this is not invariably the case and the safety precautions taken by either the independent contractor or the mine operator frequently may affect the safety of the employees of the other.

BCOA contends that the policy of holding its member companies vicariously liable for violations is arbitrary, capricious and in excess of the authority granted by the Act in that it subjects its member companies to the various penalty provisions of the Act on the basis of the activities of contractors over whom they have no control. BCOA accordingly seeks a judgment declaring that its member companies are not liable for alleged health and safety violations created by independent contractors and a permanent injunction restraining the individual defendants from enforcing the aforementioned policy against its member companies.

The foremost obstacle facing BCOA in pressing its argument is the literal wording of the Act itself. As noted, the penalty provisions of the Act are specifically enforceable against the operator of a coal mine. Section 3(h) of the Act, 30 U.S.C. § 802(h) defines "coal mine" as,

---

1. In the case of *Affinity Mining Co.*, I.D. Docket No. 73–12 (March 19, 1973) the Board of Mine Operations Appeals held that although both independent contractors and mining companies are within the definition of "operator" in the Act, only the party actually responsible for a violation of a health or safety standard should be held liable under the Act. The Bureau of Mines accordingly directed its inspectors to cite the party—whether a mining company or an independent contractor—who could have prevented a violation through supervisory control. This policy remained in effect until June 3, 1974 when, in response to Judge Gesell's decision, MESA's Assistant Administrator directed all of MESA's district managers to cite only coal mine operators for violations under the Act. In addition, on June 17, 1975 he directed MESA district managers to reissue notices and orders, which had previously been issued to mine construction contractors but the cases of which had not been closed, to the appropriate mine operators. On August 21, 1975 the Acting Secretary of the Interior issued Order No. 2977 setting forth the Department's new policy of the citing operators for violations caused by contractors.

2. Most of the construction work performed by ABC's member companies is aboveground construction, and only a minority of its member companies perform slope and shaft construction.

. . . an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such areas bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities.

And Section 3(d), 30 U.S.C. § 802(d) defines "operator" as

. . . any owner, lessee, or other person who operates, controls, or supervises a coal mine;

Thus independent contractors performing construction work on behalf of mining companies on property "used in, or to be used in, or resulting from" the extraction of coal would seemingly be working in a coal mine as defined by the Act, and for purposes of the Act the mining companies would be the operators of such coal mines. Hence the provision of Section 819 which states that penalties shall be assessed against "[t]he operator of a coal mine in which a violation occurs . . ." would apparently make the mine owners liable for violations caused by independent contractors.

BCOA argues that the Act should not be interpreted to abrogate the common law status of independent contractors; however, the Act and its legislative history make no reference to independent contractors and the definitions of "agent" and "miner" in Sections 3(e) and (g) of the Act, 30 U.S.C. § 802(e) and (g) indicate that the common law distinction between agent and independent contractor was not carried forward in the Act. "Agent" is defined as

. . . any person charged with responsibility for the operation of all or

part of a coal mine or the supervision of the miners in a coal mine.

"Miner is defined as "any individual working in a coal mine". These definitions, when considered along with the expansive definition of "coal mine", rather clearly support the defendants' contention that independent construction contractors are to be treated as statutory agents of mine operators irrespective of common law distinctions.

The legislative history of the Act, although not specifically commenting on the issue presented in this case, generally sustains the defendants' position. What emerges from a consideration of this history is that Congress was cognizant of the inadequacy of earlier legislative efforts in the field of mine health and safety, and intended to pass a comprehensive statute which would effectively regulate the health and safety of miners.[3] This remedial purpose of the statute is obvious throughout its legislative history and has been set forth in the "Congressional findings and declaration of purpose" in Section 2 of the Act, 30 U.S.C. § 801. In the light of this history and the purpose of the Act, the breadth of the definitions used in Section 3 of the Act and the broad authority given to the Secretary of the Interior in Section 101 to promulgate safety standards is not surprising. Nor is it unreasonable to conclude that Congress sought to eschew technical or common law distinctions and to make the mine operators responsible for all violations occurring at their "coal mines". The Senate Report in fact supports such a conclusion by stating:

The definition of an 'operator' is designed to be as broad as possible to include any individual, organization, or agency, whether owner, lessee or otherwise, that operates, controls, or supervises a coal mine, either directly or indirectly.[4]

---

3. See *S.Rep.*No. 91–411, 91st Cong., 1st Sess. 1–6, 42–43 (1969); *H.R.Rep.*No.91–563, 91st Cong., 1st Ses.

4. *S.Rep.*No. 91–411, 91st Cong., 1st Sess. 44 (1969).

■ In summary the court is of the opinion that the expansive wording of the definitions and the unqualified responsibility placed on mine operators by the Act compels the conclusion that the defendants can hold mining companies vicariously liable for violations attributable to their independent contractors.

■ Intervenor plaintiff ABC, in addition to supporting BCOA's argument regarding the vicarious liability of the mining companies advances the more fundamental argument that construction activity was not intended to be encompassed by the Act at all. ABC relies on the above-quoted definition of "coal mine" in the Act and argues that since the equipment, structures, facilities, etc. which are used in construction work are not "used in, or to be used in . . . the work of extracting . . . coal . . . ." construction activity was not meant to be regulated under the Act. In support of this argument ABC cites the recent case of *Association of Bituminous Contractors v. Brennan,* 372 F.Supp. 16 (D.D.C.1974) in which a three-judge district court concluded that coal mine construction companies which do not engage in coal extraction operations are not "operators" and therefore cannot be held liable for black lung payments under Title IV of the Act. Although *Brennan* involved construction by the court of the same definitions of "coal mine" and "operator" as are involved in the present case, that decision is not dispositive of this case. The decision in *Brennan* was limited to the contractors' liability under Title IV of the Act whereas the case at bar concerns Titles II and III of the Act, which are distinct from Title IV with respect to their specific remedial purpose. Although Title IV may be read as not intending to subject construction contractors to black lung liability, in terms of the purpose of that Title, this court cannot say that Ti-

tles II and III were intended to be similarly limited in light to the interrelated safety hazards faced by employees of construction contractors and those of mine operators.[5] In light of the different remedial purposes of the Titles of the Act, the construction placed on particular definitions in the Act, need not be mechanically applied to all Titles of the Act. *See Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). The court agrees with *Brennan* that construction contractors are not "operators" under the Act. However, they are statutory "agents" of operators and as such their activities are subject to regulation under Titles II and III.

In rejecting the positions advanced by ABC and BCOA the court does not denigrate the policy arguments which support these positions. As a matter of equity it seems obvious that liability should be assessed directly against the party who has responsibility for and control over a violation. By requiring mining companies to assume responsibility for violations caused by independent contractors, there is an increased potential for contract and labor disputes. Undoubtedly indemnification provisions in contracts between the mining companies and contractors will become more common and increased litigation may result. As a matter of sound policy, the court has no difficulty in agreeing with the practice endorsed by the Board of Mine Operations Appeals in *Affinity Mining Co., supra* of citing the party actually responsible for a violation. However, it is clear that after the decision in *Association of Bituminous Contractors, Inc. v. Morton, supra* the defendants were well advised to change their enforcement policy in conformity with that decision. The change which resulted, while perhaps questionable in terms of the overall equities and efficiency, is nevertheless within the authority granted by the

---

5. In this regard it is noteworthy that § 819(a)(1) which provides for the assessment of civil penalties against "the operator of a coal mine in which a violation occurs of a mandatory health or safety standard . . . ." specifically excludes violations under Title IV of the Act.

Act.[6] The arguments of policy are more appropriately addressed to Congress, which is responsible for the breadth of the Act as written.

For the reasons and authority stated it is the judgment of this court that plaintiffs' complaints for declaratory and injunctive relief are without merit. It is accordingly ORDERED that plaintiffs' complaints be and the same are hereby dismissed. This opinion shall constitute findings of fact and conclusions of law as required by *Fed.R.Civ.P.* 52(a).

---

**6.** Plaintiffs initially questioned the authority of MESA's Assistant Administrator to alter the enforcement policy established by the Board of Mine Operations Appeals on June 3 and June 17, 1975, however this new policy was affirmed by the Acting Secretary of the Interior by Order dated August 21, 1975. Such a policy decision is certainly within the authority of the Acting Secretary. Although plaintiffs question the judicial deference which should be given to such an *ex parte* change in policy, they do not now appear to question the authority of the Acting Secretary to make such a change.