BELLAIRE CORPORATION,
et al., Plaintiffs,

v.

Donna E. SHALALA, et al., Defendants.

ASSOCIATED ELECTRIC
COOPERATIVE, INC.,
Plaintiff,

v.

Marty D. HUDSON, et al., Defendants.

ASSOCIATION OF BITUMINOUS
CONTRACTORS, INC.,
Plaintiff,

v.

Donna E. SHALALA, et al., Defendants.

Civil Action Nos. 93–183(EGS), 93–944(EGS) and 93–2304(EGS).

United States District Court,
District of Columbia.

May 7, 1997.

John Martin Wood, Reed, Smith, Shaw & McClay, Washington, DC.

William Henry Howe, Howe, Anderson & Steyer, P.C., Washington, DC.

Willis Jay Goldsmith, Donald Ayers, Jones, Day, Reavis & Pogue, Washington, DC.

Herbert Emerson Forrest, Kathleen Elizabeth Moriarty, U.S. Dept of Justice, Federal Programs Branch, Washington, DC.

Richard G. Lepley, Brian G. Kennedy, U.S. Dept of Justice, Civil Div., Washington, DC.

John Robert Mooney, Paul Andrew Green, Mooney, Green, Baker Gibson, Washington, DC.

Peter Buscemi, Morgan, Lewis & Bockius, L.L.P., Washington, DC.

David West Allen, United Mine Workers of America Health and Retirement Funds, Office of General Counsel, Washington, DC.

### MEMORANDUM OPINION & ORDER

SULLIVAN, District Judge.

Plaintiffs, Bellaire Corporation ("Bellaire"), Allied–Signal, Inc. ("Allied"), Associated Electric Cooperative, Inc. ("AECI"), and Association of Bituminous Contractors, Inc. ("ABC"), commenced these separate lawsuits against the United States Department of Health and Human Services ("federal defendant") and the United Mine Workers of America Combined Benefit Fund and its Trustees ("Trustees") to challenge the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–9721 ("Coal Act"). The Court has consolidated these cases for the sole purpose of resolving in one Opinion the related issues raised by the parties.

Plaintiffs seek both declaratory and injunctive relief from enforcement of the Coal Act. They contend that the Coal Act violates both the substantive component of the Due Process and Takings Clauses of the Fifth Amendment,[1] because it imposes on them the financial responsibility for health benefits for retired coal miners—many of whom were never employed by plaintiffs—and dependents of those miners. Defendants, on the other hand, maintain that the Coal Act represents a rational Congressional response to address an escalating health-care crisis in the coal industry.

Upon consideration of the parties' cross-motions for summary judgment, the points and authorities in support of and in opposition thereto, the arguments of counsel, and for the reasons set forth herein, the Court concludes that the Coal Act, as applied to each of the plaintiffs, does not violate either the Due Process or the Takings Clauses of the Fifth Amendment. The Court also concludes that the Secretary did not abuse her discretion in applying the Coal Act to ABC. Accordingly, defendants' motions for summary judgment shall be **GRANTED,** and plaintiffs' motions for summary judgment shall be **DENIED.**

### I. FACTUAL BACKGROUND

The history of the Coal Act has been well chronicled. *See, e.g., Davon, Inc. v. Shalala,* 75 F.3d 1114, 1127 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1709) and —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1751) (holding that the Coal Act does not violate substantive due process); *Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688 (3d Cir.1996) (same); *In re Blue Diamond Coal Co.,* 79 F.3d 516, 523 (6th Cir.1996) (same); *Barrick Gold Exploration, Inc. v. Hudson,* 47 F.3d 832 (6th Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) (same); *In re Chateaugay Corp.,* 53 F.3d 478, 491 (2d Cir.1995), *cert. denied,* 516

---

1. The Fifth Amendment provides, in relevant part: "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995) (same); *Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818, 825 (W.D.Pa.1995) (same). Nevertheless, for the purposes of this Opinion, the Court will provide a brief summary.

Congress enacted the Coal Act to remedy a crisis in the funding of the two multiemployer health benefit plans, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust ("1974 Trust"), which threatened to deprive over 100,000 retired coal miners and their dependents of their promised health benefits. The 1950 and 1974 Trusts were created and funded through a series of collective bargaining agreements between the United Mine Workers of America ("UMWA") and bituminous coal operators that were represented in multiemployer collective bargaining with the UMWA by the Bituminous Coal Operators Association ("BCOA").

### A. Establishment of 1950 and 1974 Benefit Plan and Trusts

Since the 1940s, the agreements between the UMWA and BCOA have been known as National Bituminous Coal Wage Agreements ("NBCWAS"). These agreements governed the terms and conditions of employment in bituminous coal mines operated by BCOA members, as well as "me, too" operators.[2] Each NBCWA contained provisions requiring signatory coal operators to provide health benefits for both active and retired miners and their dependents. The 1978 NBCWA established the current contractual framework for providing health benefits to UMWA retirees. This agreement also introduced a provision, commonly referred to as the "evergreen clause,"[3] which specifically obligated signatory coal operators to continue making benefits contributions for as long as the NBCWA and successive NBCWAs required such contributions, regardless of whether the operators actually signed subsequent NBCWAs. *See United Mine Workers of America 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.1993) (enforcing "evergreen" provision contained in the NBCWA).

That agreement, and every agreement thereafter, required each signatory to provide for health benefits to retired UMWA miners, their spouses and dependents in three ways: (1) by contributing to the 1950 Trust, which provided benefits to miners who had retired before January 1, 1976, and their spouses and dependents; (2) by establishing a single employer to provide benefits to its own post–1975 retirees, their spouses and dependents; and (3) by contributing to the 1974 Trust, which provided benefits to post–1975 retirees, their spouses and dependents whose former employer was either "no longer in business," or no longer a signatory to an NBCWA. The most recent NBCWA was executed on February 1, 1988.

### B. Crisis in 1950 and 1974 Benefit Plan and Trusts

Despite these contractual provisions, three factors contributed to the crisis which resulted in the passage of the Coal Act. First, during the 1980s, numerous coal companies that had signed the 1978 NBCWA ceased contributing to the 1950 and 1974 Trusts, and discontinued their individual employers plans. By failing to make any further contributions, the remaining companies were forced to pay higher contributions to finance health coverage for retirees who had been abandoned by their former employees. The increased financial strain on these remaining

---

**2.** "Me, too" operators are not members of the BCOA, but, nevertheless, have agreed to be bound by the terms of the NBCWAs.

**3.** The evergreen clauses in the 1950 and 1974 Benefit Trusts that were incorporated into the 1988 NBCWA contained identical language, except that the name of the Trust was different in each clause:

> Any Employer who employed any Participant eligible for coverage under, or who receives or received benefits under, the 1950 Benefit Plan and Trust [or the 1974 Benefit Plan and Trust], or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust [or the 1974 Benefit Plan and Trust], as amended from time to time, including, but not limited to, making the contributions and paying any withdrawal liability required under the National Bituminous Wage Agreement of 1988, as amended from time to time, and any successor agreements thereto.

Evergreen clauses with substantially identical language were included in the 1950 and 1974 Benefit Trust documents that were incorporated into the 1978, 1981, and 1984 NBCWAs.

companies created a strong incentive for them to withdraw from contributing to the Trusts. Second, numerous bituminous coal industry retirees last worked for employers that were no longer in business or that could not be traced. Third, several coal operators obtained so-called "non-conforming agreements," which allowed them to discontinue or to reduce their contributions to the 1950 and/or 1974 Trusts. Meanwhile, the increasing costs of health care resulted in greater contributions for the remaining companies.

By 1990, the 1950 and 1974 Trusts had incurred a debt of over $100 million and their funding bases were declining faster than the beneficiary population. The Trusts' ability to continue to provide health care benefits was severely jeopardized, and the issue of the provision of health care benefits had contributed to a protracted strike at the Pittston Coal Company. The resulting uncertainty and significant labor disputes and unrest threatened to disrupt coal production and the economies of several coal-producing states. Against this background, Congress enacted the Coal Act.

## C. The Coal Act of 1992

A mediator, appointed by the Secretary of Labor, ultimately resolved the Pittston dispute. One of the negotiated terms of the settlement provided for the creation of the Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission" or the "Commission"), an industry-wide commission authorized to analyze the retiree health care crisis. The Coal Commission submitted its findings to the Secretary of Labor on November 5, 1990. *See* Coal Commission Report: A Report to the Secretary of Labor and the American People (Nov.1990) ("Commission Report"). In its report, the Commission found that: (1) the number of coal companies making contributions to the Trusts have declined significantly; (2) the costs of health care between 1950 and 1990 had dramatically increased; and (3) the number of "orphaned"[4] retirees had grown. Committee Report, at 2. Critically, the Commission also found that:

Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored.

Commission Report, at 1.

As a means of resolving the health care crisis, the Commission recommended that the entire coal industry pay the cost of providing for the orphan retirees by the imposition of an industry-wide tax; or alternatively, that only current and former signatories to the NBCWAs be required to finance the orphans' health costs. Following the issuance of the Commission's report, Congress held hearings to consider that report. Congress ultimately enacted the Coal Act based on the alternative recommendation of the Coal Commission that current and past signatories to the NBCWAs should bear the cost of providing health benefits to orphan retirees.

In enacting the Coal Act, Congress found that:

(1) the production, transportation, and use of coal substantially affects interstate and foreign commerce and the national public interest; and

(2) in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Coal Act of 1992, Pub.L. No. 102–486, § 19142(a)(1), (2), 106 Stat. 2776, 3037.

The Coal Act required the settlors of the 1950 and 1974 Trusts to merge the Trusts, on February 1, 1993, into the United Mine Workers of America Combined Benefit Fund ("Combined Fund"), a new statutorily created private trust fund that provides health benefits to people who were receiving (and were eligible to receive) benefits from the 1950 or 1974 Benefit Trusts as of July 20, 1992. 26 U.S.C. §§ 9702(a), 9703(f). The

---

4. Orphans are those individuals whose employers have either gone out of business or no longer provide health care benefits.

Coal Act directs the Secretary of Health and Human Services to match the Combined Fund beneficiaries with the operators who formerly employed them.[5] The 1988 NBCWA signatories are required by the Coal Act to make contributions to the Combined Fund to pay off, by September 30, 1994, the deficits incurred in the 1950 and 1974 Trusts as of February 1, 1993, the day the trusts were merged into the Combined Fund. *Id.* § 9704(i)(B), (E).

Moreover, the Coal Act authorizes the transfer of $70 million per year for each of the first three Combined Fund years from the 1950 UMWA Pension Plan. *Id.* § 9705(a). The second and third year transfers may be used only to reduce the operators' unassigned beneficiary premiums and death benefit premiums; and none of the transfers can be used to offset the deficit reduction contributions owed by the 1988 operators. *Id.* § 9705(a)(3). To prevent further "dumping" into the Combined Fund, the Act also requires NBCWA signatory operators that were providing health benefits to their own retirees on February 1, 1993, to continue to provide benefits to those retirees under an individual employer plan. *Id.* § 9711. The Coal Act also establishes another multiemployer plan—the 1992 UMWA Benefit Plan—as a safety net to provide health benefits to people who should receive coverage under an individual employer plan but do not. *Id.* § 9712(b)(2)(B). The premiums paid by the 1988 NBCWA signatories, *id.* § 9712(d)(1)(A), (C), and NBCWA signatories whose former employees receive benefits from the 1992 Plan, *id.* § 9712(d)(1)(B), (d)(3), will provide the financing for the 1992 Plan.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56, only if there are

no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment, only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975). In the opinion of the Court, the pending cross-motions for summary judgment present no genuinely disputed material facts that would preclude summary judgment for any party.

## III. CONSTITUTIONALITY OF THE COAL ACT

Each plaintiff argues, with varying degrees of vigor, that the Coal Act violates the Due Process Clause of the Fifth Amendment of the United States Constitution. Bellaire and Allied also argue that the Coal Act violates the Takings Clause of the Fifth Amendment of the United States Constitution.

### A. Due Process

#### 1. Bellaire and Allied

■ Bellaire was a signatory to the 1974, 1978, 1981, and 1984 NBCWAs. During the terms of the 1974 and 1978 NBCWAs, Bellaire was a member of the BCOA. The federal defendant and Trustees argue that Bellaire's membership in the BCOA expressly authorized the BCOA to negotiate on its behalf the terms and conditions of those NBCWAs, including the eligibility and benefit levels of the 1950 and 1974 Trusts. Although Bellaire withdrew from the BCOA in December 1980, it was a "me, too" signatory to the 1981 and 1984 NBCWAs and signed two extension agreements that obligated it to provide health benefits to its own retirees until January 20, 1990.

---

5. The Secretary is directed to assign each Combined Fund beneficiary to the coal mine operator that was a signatory to the 1978 NBCWA or any subsequent NBCWA and was the most recent signatory operator to employ the retiree for at least two years. 26 U.S.C. § 9706(a)(1)(A). If the Secretary cannot find such an employer, the beneficiary should be assigned to the operator that signed the 1978 NBCWA or a subsequent

NBCWA and was the most recent signatory operator to employ the retiree. *Id.* § 9706(a)(1)(B). Finally, if the Secretary cannot assign the beneficiary pursuant to either of these methods, the beneficiary should be assigned to the NBCWA signatory operator that employed the retiree for the longest period of time prior to the effective date of the 1978 NBCWA. *Id.* § 9706(a)(2)(B).

In 1988, Bellaire sold its only remaining bituminous coal mining operations, and did not sign the 1988 NBCWA. Bellaire argues that only when the UMWA threatened to disrupt this sale did Bellaire agree to sign two extension agreements to the 1984 NBCWA requiring it to provide health benefits, but only to its own UMWA retirees through January 1990. The Coal Act requires Bellaire to provide lifetime benefits to approximately 2800 individuals. Of the 2800 individuals, 1400 are former Bellaire employees and their spouses and dependents. The other 1400 are "orphans" whom Bellaire has never employed. Bellaire claims that the provision of these benefits will cost Bellaire about $5 million during its first-year contribution to the Combined Fund, and a total of $100 million, after-tax.

Allied was a signatory to the 1974 and 1978 NBCWAs. During the terms of those agreements, Allied was a member of the BCOA. Again, the federal defendant and Trustees argue that membership in the BCOA expressly allowed the BCOA to negotiate on Allied's behalf. In 1980, Allied disposed of its last two remaining coal mining operations. Although the 1978 NBCWA expired on March 27, 1981, Allied continued to provide for retiree health benefits until September 1982. During ensuing litigation against the UMWA, Allied obtained a judgment from the United States Court of Appeals for the Fourth Circuit, sitting *en banc*, which concluded that Allied's funding obligations continued "only for the life of the 1978 contract." *See District 17 v. Allied Corp.*, 765 F.2d 412, 417 (4th Cir.) (*en banc*), *cert. denied*, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985).[6]

On December 21, 1988, Allied entered into a consent judgment in the United States District Court for the Southern District of West Virginia with the UMWA, the 1974 Trust, and a class of UMWA retirees receiving health benefits from the 1974 Trust. Pursuant to the consent judgment, Allied agreed to provide health benefits only to certain retirees who had retired from the Harewood Mine in West Virginia. The consent judgment also declared that Allied "shall have no further obligation to provide health and non pension benefits" to retirees from another mine, Shannon Branch Mine in West Virginia. Allied argues that this judgment enjoined the 1974 Trust, the UMWA, or the beneficiary class from taking any action designed to transfer the Shannon Branch liabilities to Allied. As of February 1, 1993, Allied was responsible for providing health coverage for its retirees who retired from its Harewood Mine in West Virginia. The Coal Act assigned Allied 1540 beneficiaries. Of this number, 670 were formerly employed by Allied and retired before January 1, 1976. Another 100 of this figure are also former employees, but retired from the Shannon Branch Mine after January 1, 1976. The other 770 beneficiaries were never employed by Allied. Allied estimates that the provision of these benefits will cost Allied $1.5 million during Allied's first full year of its contributions to the Combined Fund, and a total of approximately $50 million.

Both Allied and Bellaire admit that after the expiration of the 1974 and 1978 NBCWAs, both companies ceased contributing to the 1950 and 1974 Trusts and discontinued their individual employer plans, leaving their post–1975 retirees to receive health coverage from the 1974 Benefit Trust.

Bellaire and Allied advance two principal arguments in support of their position that the Coal Act, as applied to them, violates their Fifth Amendment substantive due process rights. First, they argue that the Coal Act requires them to pay health benefits for UMWA retirees solely because of pre-enactment obligations made, and long since discharged, by these employers. Bellaire and Allied contend that the Coal Act arbitrarily imposes retroactive liabilities upon them in favor of not only their former employees, but many others who were never employed by either company. Second, Bellaire and Allied argue that the Due Process Clause imposes greater restrictions when Congress attempts to impose liabilities retroactively than when it legislates prospectively. *See General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112

---

6. Allied was ordered by the appellate court, however, to continue to provide funding for certain health retiree benefits as a remedy for Allied's breach of an entirely separate provision of the 1978 NBCWA.

S.Ct. 1105, 117 L.Ed.2d 328 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.").

Bellaire and Allied's challenges to the constitutionality of the Coal Act are not novel. Indeed, every federal court that has addressed the substantive due process issue has concluded that the Coal Act does not violate the substantive component of the Fifth Amendment's Due Process Clause. *See, e.g., Davon, Inc. v. Shalala,* 75 F.3d 1114, 1127 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1709) and — U.S. —, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1751) (holding that the Coal Act does not violate substantive due process); *Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688 (3d Cir.1996) (same); *In re Blue Diamond Coal Co.,* 79 F.3d 516, 523 (6th Cir.1996) (same); *Barrick Gold Exploration, Inc. v. Hudson,* 47 F.3d 832 (6th Cir. *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) (same)); *In re Chateaugay Corp.,* 53 F.3d 478, 491 (2d Cir.1995), *cert. denied,* 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995) (same); *Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818, 825 (W.D.Pa.1995) (same).

In considering due process challenges to economic legislation such as the Coal Act, the Supreme Court has repeatedly held that such legislation must be sustained, unless Congress has acted arbitrarily or irrationally. In *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Court stated that:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Id.* at 15 (citing *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963)); *see also Pension Benefit Guaranty*

*Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Williamson v. Lee Optical of Okl.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

■ Economic legislation comports with due process if it bears a rational relation to a legitimate governmental purpose. *Regan v. Taxation With Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 83–84, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Colorado Springs Production Credit Ass'n v. Farm Credit Admin.,* 758 F.Supp. 6, 9 (D.D.C. 1991), *aff'd,* 967 F.2d 648 (D.C.Cir.1992). Moreover, when considering how to finance economic legislation, Congress has "absolutely no obligation to select the scheme that a court [will later] find to be the fairest, but simply one that [is] rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985); *see also Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) ("[T]he Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation."). This deferential standard of review applies even if the economic legislation "upsets settled expectations," or "imposes a new duty or liability based on past acts." *Turner Elkhorn,* 428 U.S. at 16.

As support for their position, Bellaire and Allied primarily rely upon *Railroad Retirement Bd. v. Alton R.R. Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935).[7] *Alton* involved a due process challenge to the Railroad Retirement Act, a statute that required railroad carriers to provide industry retirees with lifetime pension benefits. The statute established a fund to provide the benefits, and it required carriers to contribute to the fund at rates determined with reference to current payrolls. The statute extended to all railroad employees who had retired within one year prior to its enactment. *Alton,* 295 U.S. at 344–45.

---

7. Bellaire and Allied also rely on Justice O'Connor's concurrence in *Connolly* in which she stated that "the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational ... in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly,* 475 U.S. at 229 (citations omitted).

The Court unanimously concluded that the statute was "arbitrary in the last degree" and, therefore, unconstitutional, as applied to those retirees. *Id.* at 349. The Court found arbitrariness demonstrated by two sources: (1) the retroactive upsetting of settled expectations between the employer and employee; and (2) the requirement that employers compensate beneficiaries with whom they had never had any employment relationship:

> Plainly this requirement alters contractual rights; plainly it imposes for the future a burden never contemplated by either party when the earlier relation existed or when it was terminated. The statute would take from the railroads' future earnings amounts to be paid for services fully compensated when rendered in accordance with contract, with no thought on the part of either employer or employee that further sums must be provided by the carrier. The provision is not only retroactive in that it resurrects for new burdens transactions long since past and closed; but as to some of the railroad companies it constitutes a naked appropriation of private property upon the basis of transactions with which the owners of the property were never connected. Thus the act denies due process of law by taking the property of one and bestowing it upon another.

*Id.* at 349–50.

The daunting challenge plaintiffs face, however, is that Alton represents the last case in which the Supreme Court invalidated an economic regulation pursuant to a substantive due process challenge. As the Second Circuit aptly observed, "[t]he doctrinal landscape which confronts [plaintiff's] due process challenge encompasses unusually inhospitable legal terrain." *In re Chateaugay Corp.*, 53 F.3d at 487. Furthermore, the post-*Alton* cases decided by the Supreme Court have shown a distinctly more deferential standard for reviewing economic legislation. *See, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (holding that retroactive Multiemployer Pension Plan Amendments Act's (MPPAA) withdrawal liability provisions "suffices for substantive due process scrutiny"); *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (holding that application of withdrawal liability provisions of MPPAA to employers withdrawing from pension plans does not violate Fifth Amendment's Due Process Clause); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (upholding retroactive federal law which required coal operators to compensate certain employees for disabilities caused by black lung disease).

Plaintiffs also contest the Coal Act's apportionment of contribution obligations based on the number of former employees, where the Railroad Act in *Alton* was based on the current payroll. The Coal Act's use of the number of former employees as the apportionment criterion is especially arbitrary, plaintiffs contend, because mining operators always had apportioned their NBCWA contractual obligations under two entirely different criteria—tons of coal mined and hours of labor worked—that vary with current economic activity. Also, the Coal Act's scheme does not allow Bellaire and Allied to pass its new obligations onto its customers.

Finally, plaintiffs argue that the Coal Act's retrospective employment criterion is singularly arbitrary as applied to former operators like Bellaire and Allied because these companies no longer mine bituminous coal. Thus, they do not have current bituminous coal mining revenues against which to offset their current contribution obligations and do not have current bituminous coal customers among whom to spread the cost of those obligations.

The Court is not persuaded by the arguments advanced by Bellaire and Allied. In the Court's view, Bellaire and Allied have been unable to meet the heavy burden of demonstrating that Congress acted in an arbitrary or irrational way in enacting the Coal Act. Having determined that only NBCWA operators would be accountable for the stabilization of the Trusts, Congress established a specific funding mechanism for spreading the necessary costs. The Coal Act is supported by a legitimate governmental purpose and was enacted after finding that:

(1) the production, transportation, and use of coal substantially affects interstate

and foreign commerce and the national public interest; and

(2) in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Coal Act of 1992, Pub.L. No. 102–486, § 19142(a)(1), (2), 106 Stat. 2776, 3037.

Moreover, the means chosen by Congress to achieve the Coal Act's stated purposes were rational. The federal defendant and Trustees stress that the Coal Act was only enacted after years of debate in Congress and substantial investigation into how best to achieve the goal of providing health benefits for retired coal mine workers.[8] Both defendants argue that Congress' ultimate adoption of an approach whereby Bellaire and Allied and other signatories to NBCWAs would bear the cost of stabilizing the Trusts, thereby ensuring that the retired miners continue to receive their health benefits, was rational.[9]

Federal defendant and Trustees also rely on this circuit's decision in *Washington Star Company v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502 (D.C.Cir.1984), to support their position. In *Washington Star,* the circuit rejected a due process challenge to the withdrawal liability provisions of the Multiemployer Pension Plan Act Amendments of 1980 ("MPPAA"), which required an employer that withdraws from a multiemployer plan to pay its share of the plan's unfunded vested liabilities. *Washington Star,* 729 F.2d at 1509–11. The MPPAA's withdrawal provisions were designed to ensure that pension plans avoid further funding problems similar to those confronting the 1950 and 1974 Trusts at the time Congress enacted the Coal Act. *See id.* at 1504.

The *Washington Star* court held that the MPPAA withdrawal liability provisions satisfy the requirements of substantive due process because they are a rational means of allocating among a group of employers the collective burden of ensuring that their employees receive their vested pension benefits. *Id.* at 1510. Thus, the Circuit rejected the employer's argument that the withdrawal liability provisions—which required the employer to pay the pension plan over $525,000, even though the employer had already made all the contributions required by the collective bargaining agreement—violated due process "because of the retroactive effect they have on preexisting contractual arrangements." *Id.* at 1506.

The 1978 NBCWA and subsequent NBCWAs mandated that signatory operators provide these health benefits not only to their own retirees through individual employer plans, but also to make contributions to the 1950 and 1974 Trusts for the benefit of tens of thousands of beneficiaries who had never worked for the contributing signatory operators. The federal defendant and Trustees contend that by incorporating the evergreen clauses from the 1950 and 1974 Trusts, each of these NBCWAs also required signatory operators to continue to contribute to the Benefit Trusts at the rate specified in the subsequent NBCWA, even if they were not signatories to the subsequent NBCWA. *See Pittston,* 984 F.2d at 473. Under these circumstances, Congress did not act arbitrarily and irrationally in requiring the NBCWA signatories to make contributions to the Combined Fund to cover the costs of providing benefits for their own retirees and to bear small portion of the costs of providing benefits to the orphan retirees.

Furthermore, as recognized by the federal defendant and Trustees, Bellaire and Allied, through their membership in the BCOA, expressly authorized BCOA to negotiate the 1978 NBCWA on their behalf. In several provisions that federal defendant and Trustees maintain Bellaire and Allied ignore, the 1978 NBCWA—as well as the 1981 and 1984 NBCWAs that Bellaire subsequently executed, and the 1988 NBCWA that expired on

---

8. The federal defendant and Trustees acknowledge, however, that the length of the legislative process leading to the passage of the Coal Act would not alone satisfy due process concerns.

9. Although Congress initially considered the imposition of an industry wide tax, Congress rejected this approach in the final analysis.

February 1, 1993—provided that each retired miner was "entitled to receive health benefits until death" or "to retain a Health Services card for life."

While, admittedly, the Coal Act's financing structure assesses contributions to the Combined Fund based on the number of beneficiaries each operator has in the Fund, rather than the prior NBCWA formula which was based on varying combinations of the number of hours worked and tons of coal mined, this fact does not detract from the rationality of the Act. Moreover, Bellaire and Allied's argument that the Coal Act is arbitrary, because an operator's Combined Fund premiums are based on the number of its assigned beneficiaries, rather than on some measure of current output and thus may not be passed on to its customers, is identical to an argument that the Supreme Court rejected in *Turner Elkhorn*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

In *Turner Elkhorn*, coal miners challenged the constitutionality of certain provision of the Black Lung Benefits Act of 1972 that required operators to pay benefits to miners who contract pneumoconiosis, even if the miners left employment in the coal industry before the effective date of the Act. Like Bellaire and Allied, the plaintiffs in *Turner Elkhorn* claimed "that the Act spreads cost in an arbitrary and irrational manner by basing liability upon past employment relationships, rather than taxing all coal mine operators presently in business." *Turner Elkhorn*, 428 U.S. at 18. In rejecting that argument, the Supreme Court stated the choice as to whom should bear the burden is one "for Congress" not the courts. *Id.* The Court stated that it was "unwilling to assess the wisdom of Congress' chosen scheme by examining . . . the degree to which the retrospective liability imposed on early operators can now be passed on to the consumer." *Id.* at 18–19. Moreover, the Court concluded that the Act satisfied the requisites of due process because it "approaches the problem of cost-spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Id.* at 19.

Plaintiffs' attempt to distinguish *Turner Elkhorn* is unpersuasive. Plaintiffs contend that, in the context of Turner Elkhorn, the Court held that retroactive imposition of liability, based upon past employment relationships, was a "rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and coal customers." *Id.* at 18. Thus, plaintiffs argue that the Supreme Court distinguished *Turner Elkhorn* from *Alton* on the grounds that a miner's need for black lung disability benefits, as opposed to a railroad worker's need for retirement income, is directly attributable to his former employment relationship:

> The point of the black lung benefit provisions is not simply to increase or supplement a former employee's salary to meet his generalized need for funds. Rather, the purpose of the Act is to satisfy a specific need created by dangerous conditions under which the former employee labored—to allocate to the mine operator an actual, measurable cost of his business.

*Id.* at 19.

Here, plaintiffs argue that the Coal Act entitles UMWA retirees, their spouses, and dependents to receive comprehensive health benefits to treat conditions ranging from mental illness to drug abuse to pregnancy. Unlike black lung disease, they argue, none of these conditions constitutes a "specific need" created by conditions of the retirees' former employment.

Not surprisingly, plaintiffs contend that the Coal Act is indistinguishable from the portions of the Railroad Act unanimously disapproved in *Alton.* Both statues required employers in a specific industry to provide lifetime benefits to their own previously retired employees, and to retirees never employed, based solely on pre-enactment contracts made, and fully satisfied, by affected employers. In the Court's view, a comparison of the reasoning of *Alton* with the reasoning in later cases such as *Turner Elkhorn* and *Washington Star* demonstrates that *Alton,* although never overruled, no longer represents an accurate, persuasive, interpretation of the Due Process Clause. Federal defendant and Trustees cite to this court's decision in *Chew v. Quesada,* 182 F.Supp. 231, 232 (D.D.C.1960), where this court stat-

ed that "[t]he evidence is overwhelming that Alton is no longer controlling law." Other federal courts have also questioned the continued viability of the *Alton* decision. *See, e.g., Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1266 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984) ("The Court's method of analysis in Turner Elkhorn Mining represents a fundamental shift from that employed in *Alton* Railroad."); *A–T–O, Inc. v. Pension Benefit Guar. Corp.*, 634 F.2d 1013, 1025 n. 13 (6th Cir.1980) ("[W]e ... question the continued vitality of the Supreme Court's reasoning in [Alton]."); *In re Chateaugay Corp.*, 53 F.3d at 487 ("In both letter and spirit, *Alton* belongs to the long-discredited era of Lochner-style judicial activism.").

Even if *Alton* is still controlling law, *Alton* is distinguishable from this case. First, the Coal Act requires NBCWA signatories to participate in multiemployer plans similar to those in which they participated under the NBCWAs. In *Alton* the Railroad Act forced employers that had previously provided pensions only to their own employees to participate in a multiemployer plan in which they would now have to provide pensions to employees of other employers. Second, the Coal Act requires NBCWA signatories to provide health benefits that are substantially the same as those promised in the post–1978 NBCWAs and Trusts Agreements, whereas in *Alton* the employers were forced to provide entirely new benefits designed by Congress and not previously agreed to by the railroads. *See Alton*, 295 U.S. at 349 ("this requirement ... imposes for the future a burden never contemplated by either party when the earlier relation existed or when it was terminated.").

Plaintiffs' second argument fairs no better than its first. Bellaire and Allied claim that the retrospective effect of the Coal Act violates the substantive component of the Due Process Clause. Bellaire claims the Coal Act has an eight-year retroactive period as applied to it; Allied faces a fourteen-year retroactive period. As the Supreme Court stated in *Turner Elkhorn*, "[i]t does not follow, how-

ever, that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process and the justifications for the latter may not suffice for the former." *Turner Elkhorn*, 428 U.S. at 16–17.

However, this Court is not convinced that the Coal Act is retrospective legislation. As the court in *In re Chateaugay Corp.* recognized "[t]he Coal Act contains no requirement that signatory operators pay for health benefits delivered prior to the effective date of the statute. Thus, the financial impact of the Coal Act on assigned operators is strictly prospective: only the weight and duration of the funding burdens vary according to past acts." 53 F.3d at 491.[10] In any event, the Court concludes that "any degree of retrospection" imposed on plaintiffs by the Coal Act is rationally related to the plaintiffs' involvement with the Trusts, and the funding mechanism chosen by Congress is reasonable. Accordingly, the Coal Act does not violate Bellaire and Allied's substantive due process rights. The Court will now address AECI's due process arguments.

### 2. AECI

AECI also claims that the Coal Act violates its substantive due process rights. AECI is a Missouri Rural electric cooperative engaged in the business of generating and distributing electricity throughout its service area in Missouri and southeastern Iowa. To generate electricity, AECI operates two coal fired power stations: the New Madrid Plant and the Thomas Hill Plant. Effective June 1, 1977, AECI purchased the Bee Veer and Prairie Hill mines from Peabody Coal Company. By agreement, Peabody continued to operate the mines until January 1, 1980, at which time AECI assumed control and operation of them.

At the time of AECI's acquisition of the Bee Veer and Prairie Hill mines, Peabody was a signatory of the 1978 NBCWA. In accordance with the agreements successor-

---

10. The Court also notes that plaintiffs' retrospective argument pales in comparison to the companies involved in *Templeton Coal Co. v. Shalala*, 855 F.Supp. 990 (S.D.Ind.1993), *aff'd sub nom.,* *Davon, Inc. v. Shalala*, 75 F.3d 1114 (7th Cir. 1996), where the companies had left the coal industry, and last signed NBCWAs in the 1950's and 1960's.

ship clause, Peabody, according to AECI, insisted that AECI agree to accept the terms of the 1978 NBCWA, which was in effect at the time AECI began operation of the mines. In February 1980, AECI signed a "me, too" contract incorporating the 1978 NBCWA agreement. AECI subsequently became a member of BCOA and, by virtue of that membership, was bound by the 1981 NBCWA. AECI withdrew from BCOA in 1983, but later signed "me, too" contracts incorporating the 1984 and 1988 NBCWAs. The 1988 NBCWA expired on February 1, 1993. On December 30, 1988, AECI purchased the assets of Nemo Coal, Inc., which owned and operated a coal mine in Missouri. At the time of acquisition, the mine was shut down, and AECI never reopened it.

In January 1993, AECI decided to close its bituminous coal mines and convert its boilers at the New Madrid and Thomas Hill Plants to accommodate low-sulphur sub-bituminous coal, which is brought to the Plants by rail from Wyoming. AECI closed its mining operations on February 2, 1993. On February 1, 1993, AECI employed 334 UMWA-represented workers, of which 268 UMWA-represented workers were laid off: AECI still employs 66 UMWA workers.

As a signatory to the 1988 NBCWA, AECI is required by the Coal Act to contribute to the Combined Fund to pay for the first eight months of operation.[11] 26 U.S.C. § 9704(i)(1)(A) & (B). In addition, as a signatory to the 1988 NBCWA, AECI is also required to pay its share of the deficit incurred by the Trusts, to pay an annual prefunding premium, and to provide security to the 1992 UMWA Plan.[12] AECI, however, was not assigned any retirees who received benefits under the Combined Fund, and AECI is not required to pay any subsequent annual premiums to the Combined Fund.

AECI claims that Congress' decision requiring AECI to contribute to the Combined Fund, and the 1992 Benefit Plan, is arbitrary and indefensible because AECI is not in any way responsible for the funding deficit in the 1950 and 1974 Trusts, or responsible in any way for the liabilities of either statutorily created benefit plans.

### a. AECI's Contribution to Combined Fund

 AECI contends that, unlike the employers in *Turner Elkhorn, R.A. Gray*, and *Concrete Pipe*, it is not accountable in any way for the liabilities that triggered Congressional action. AECI argues that the company did not dump its, or Nemo Coal's, retirees into either Fund by going out of business or ceasing participation in the UMWA Funds, but rather maintained its individual employer plan and made contributions required by the 1978 NBCWA. AECI also argues that none of its or Nemo's current or former employees are beneficiaries of the Combined Fund. AECI further maintains that the company is required to contribute to the Combined Fund solely because AECI was a signatory to the 1988 NBCWA. AECI also notes that its contributions are based upon work performed under the 1988 NBCWA, when AECI employed more than 300 UMWA workers, while the company now only employs 66 people. Moreover, AECI claims it is not entitled to any offset for its contributions because AECI has no beneficiaries in the Combined Fund.

AECI, federal intervenor-defendant, and defendant-Trustees agree that *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395 (S.D.Ohio 1993), *aff'd*, 47 F.3d 832 (6th Cir.1995),[13] is the most factually analogous to AECI's argument. The employers in *Barrick Gold*, like AECI, were signatories to the 1988 NBCWA agreement but had no beneficiaries in the Combined Fund. AECI argues that it did not enter the coal business until 1980, and at Peabody's insistence, AECI signed a "me, too" agreement incorporating

---

11. AECI owes $600,000 for its proportionate share of the benefits and administrative cost during the Plan's first year.

12. At the time of the briefing of this case, this figure has not been calculated. AECI has not supplemented its pleadings to provide the Court with a current figure.

13. AECI claims the other decisions all share the commonality that plaintiffs in those cases *were* assigned beneficiaries of the Combined Fund. *See, e.g., In re Blue Diamond Coal Co.*, 79 F.3d 516 (6th Cir.1996); *In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995), *cert. denied*, 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

the 1978 NBCWA. As a result, AECI concedes that it became obligated to contribute to the 1950 Trust. Despite this, AECI argues that this requirement (contributing to 1950 Fund) was irrational as applied to AECI because it was impossible for any of AECI's employees to become beneficiaries of the 1950 Trust. AECI claims that "[t]he fact that AECI made compulsory contributions pursuant to an irrational labor agreement, ... does not justify Congressional adoption of irrational contribution requirements." AECI's Mot. for Summ. Judg. at 22. AECI concedes that it has some minimal prior connection to the 1950 and 1974 Benefit Plans, but argues that the Due Process Clause requires more. Thus, AECI argues that Congress' action is irrational as applied to AECI because AECI was not responsible for any of the Fund's liabilities.

This precise argument was raised, and ultimately rejected, by the *Barrick Gold* court. In *Barrick Gold*, as here, the employers had made contributions required by the 1988 NBCWA and prior agreements, notwithstanding that none of their retired workers were beneficiaries of either benefit trust. The court held that since the employers had "some prior connection to the payment of benefits to participants in the predecessors of the Combined Fund," a rational basis existed for requiring the employers to contribute to the Combined Fund. *Barrick Gold*, 823 F.Supp. at 1403. Moreover, as a signatory to the 1988 NBCWA, AECI was obligated to make contributions to the Trusts. As the court stated in *Barrick Gold*, "[i]t is rational and reasonable for Congress to hold the 1988 operators, including plaintiffs, responsible for these inadequately funded obligations which stem from a period when plaintiffs were signatories to the NBCWA and were contractually obligated to contribute toward these obligations." *Barrick Gold*, 823 F.Supp. at 1403. Similarly, this Court concludes that the requirement imposed on 1988 NBCWA signatories, such as plaintiffs, to contribute to the Combined Fund is entirely reasonable and rational.

AECI's argument that it bears no responsibility for the beneficiaries of the Combined Fund fares no better. By signing the 1988 NBCWA, AECI agreed not only to provide benefits to its own retirees through individual employer plans, but also undertook responsibility for other retirees and an obligation to pay contributions to the 1950 and 1974 Benefit Trusts.

### b. AECI's Required Contributions to 1992 Benefit Plan

AECI's argument in support of its claim, that it should not be required to contribute to the 1992 Benefit Plan, is but a derivative of its first. The Coal Act requires signatories to the 1988 NBCWA to contribute to the newly-created 1992 Benefit Plan based upon the number of potential beneficiaries of the Plan employed by each signatory. 26 U.S.C. § 9712. The underlying assumption for this requirement, according to AECI, is that certain coal operators may go out of business, terminate their individual employer plans, and dump retirees into the 1992 Plan. AECI claims that this contribution obligation is irrational as applied to AECI because there is zero risk that AECI will go out of business and dump retirees into the 1992 Benefit Plan.

AECI claims that even if it were to cease to exist as a result of a merger or acquisition by another company, the successor company would be required to maintain AECI's individual employer plan. AECI also states that, unlike coal operators who occasionally fall prey to competition and depleted coal reserves, AECI is a regulated electric utility with a monopoly in its service area. Moreover, the Rural Electrification Administration (REA), which regulates AECI, has the authority to force AECI to raise the rates it charges for electricity to ensure that AECI does not default on its loans from REA.

Federal intervenor-defendant and Trustees contend that AECI's claim that AECI is in no danger of going out of business is misguided, in that Congress is under no obligation to calibrate the amount of insurance premiums that a company must pay based on an individual assessment of the likelihood that this particular company will go out of business. *See Barrick Gold*, 823 F.Supp. at 1406. Furthermore, the fact that AECI is a rural electric cooperative does not insure that it will not face financial problems and cease to provide benefits for its employees. As the court noted in *Barrick Gold*, "it is not unreasonable to require plaintiffs to provide some surety toward the satisfaction of their obli-

gation to provide lifetime health benefits." *Barrick Gold,* 823 F.Supp. at 1406.

In this Court's view, AECI's argument against contributing to the 1992 Benefit Fund is essentially the same as its argument against contributing to the Combined Fund, and for the same reasons, the requirement that AECI contribute to the 1992 Benefit Fund is rational and reasonable. Thus, the Court concludes that the Coal Act does not violate the substantive due process rights of AECI because the liabilities imposed upon AECI are rationally related to AECI's status as a signatory to the 1988 NBCWA.

### 3. ABC

■ Relying on the same cases as the other plaintiffs (Bellaire, Allied, and AECI), ABC also argues that the application of the Coal Act to it violates due process. ABC notes that, of all the cases addressing the constitutionality of the Coal Act, none have addressed a challenge by a non-coal miner operator that ceased participation in the UMWA Benefit Funds with the agreement of the UMWA and BCOA and removed all ascertainable liabilities attributable to it from the UMWA Benefit Funds. ABC argues that there is no comparable way that ABC members bear responsibility for the plan's liabilities. When the Retired Construction Workers Benefit Trust ("RCWBT") was created in 1978, the beneficiaries of the 1974 Benefit Trust attributable to ABC's members left the UMWA plan. ABC argues that it had nothing to do with the condition of the Trusts when the Coal Act was enacted.

Federal defendant and Trustees argue that during the period from 1968 to 1978, employees of ABC companies were eligible for health and medical benefits from the 1950 Trust, and after 1974, from the 1974 Trust. For the first six years of this period, ABC was not required to finance the health and medical benefits. During the 1974 negotiations, however, ABC was solicited by UMWA and BCOA to pay direct contributions, on an hourly basis, for ABC employees receiving benefits. As a result, ABC did pay until June 1978, when it established its own fund for mine workers. Federal defendant and Trustees argue that ABC should not be allowed to continue to get a "free ride."

For the reasons previously articulated, with respect to Bellaire, Allied, and AECI, the Court concludes that the Coal Act does not violate ABC's due process rights. ABC's members received benefits from the Trusts and, in fact, it is undisputed that for a period of time, ABC's members received those benefits even though ABC's members were not required to make contributions. The Coal Act represents a rational, reasonable response on the part of Congress to address a health care crisis in the coal industry where retired workers' lifetime health benefits were in jeopardy. While certainly no one company is solely responsible for the condition of the Trusts which precipitated the enactment of the Coal Act, Congress determined that the enormity of the problem required the assistance of all companies who had been affiliated with the Trusts. Those companies include ABC, and hence, ABC's due process argument must fail.

### B. Takings Clause

■ Bellaire and Allied also argue that the Coal Act, which requires them to make monetary contributions to benefits funds, violates the Takings Clause of the Fifth Amendment. The Takings Clause prohibits the government from taking private property for public use without paying the former owner just compensation. U.S. Const. amend. V. This clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

### 1. Subject Matter Jurisdiction

■ As a preliminary matter, the federal defendant notes that a substantial question exists as to whether this Court has jurisdiction over plaintiffs' taking challenge where the Tucker Act, 28 U.S.C. § 1491(a),[14] pro-

---

**14.** This section provides, in relevant part:
The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon an express or implied contract with the United States, or for liquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1).

vides an adequate process for seeking just compensation. Under the Tucker Act "takings claims against the Federal Government are premature until a property owner has availed itself of the process provided by the Tucker Act." *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 816 (D.C.Cir.1993) (quoting *Williamson Co. Regional Planning Commission v. Hamilton,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). Moreover, pursuant to the Tucker Act, exclusive jurisdiction is conferred on the Court of Federal Claims, if the amount in controversy is at least $10,000. *Id.* The defendants concede, however, that Bellaire and Allied are seeking only declaratory relief, not money damages.

This issue was previously raised in *In re Chateaugay Corp.,* 163 B.R. 955 (S.D.N.Y. 1993), *aff'd,* 53 F.3d 478 (2d Cir.1995), and the court's discussion provides meaningful guidance on this issue. There, the court concluded that the district court had jurisdiction over the takings claim because, (1) plaintiffs were not seeking money damages, but rather a declaratory judgment that the Coal Act is unconstitutional; (2) the Court of Claims did not have jurisdiction to hear claims against parties other than the United States, and since the Trustees were necessary parties to the litigation, the Court of Claims would be without jurisdiction to award full relief in that case; and (3) plaintiffs' takings claim was indistinguishable from its due process claim, and the Court of Claims would not have jurisdiction over the due process claim.

■ Like plaintiffs in *In re Chateaugay Corp.,* Bellaire and Allied are not seeking monetary damages, but rather declaratory relief. However, in view of precedent in this circuit, this fact alone will not provide this Court with jurisdiction. In *Railway Labor Executives' Ass'n v. U.S.,* 987 F.2d 806 (D.C.Cir.1993), a group of unions sought a declaratory judgment that rulings by the ICC modifying the terms of a collective bargaining agreement violated the Takings Clause. This circuit held that even though the plaintiffs made no claim for monetary damages, the action was within the exclusive

jurisdiction of the Court of Claims. *Railway,* 987 F.2d at 815–16.

This case is distinguishable from Railway. Like *In re Chateaugay Corp.,* but unlike *Railway,* the Trustees are necessary parties to this lawsuit. *See* Fed.R.Civ.P. 19(a).[15] Thus, because the Court of Claims does not have jurisdiction to hear claims against private parties, the Court of Claims would be without jurisdiction to hear the challenges raised in this action. *See Kennedy v. United States,* 19 Cl.Ct. 69, 75–76 (Cl.Ct.1989) ("[I]f the relief sought is against others than the United States, the suit as to them must be ignored as beyond the jurisdiction of the Court [of Claims] .... Furthermore, if the maintenance of a suit against private parties is a prerequisite to the prosecution of the suit against the United States, the suit must be dismissed." (citing *United States v. Sherwood,* 312 U.S. 584, 588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941))).

Another distinction is that the *Railway Labor Executives'* decision was made within the context of respondent's modification of terms of the petitioner's collective bargaining agreements, where, in this case, plaintiffs challenge a statute mandating monetary contributions to benefits funds.

The Court also notes that the Supreme Court, when addressing challenges to similar economic legislation statutes, has considered takings challenges in situations where the plaintiffs did not first seek compensation in the Court of Claims. *See, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* 508 U.S. 602, 640–47, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 221–28, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). The Court further notes that plaintiffs' "takings claim is indistinguishable from their due process claim." *In re Chateaugay Corp.,* 163 B.R. at 959.

### 2. Does the Coal Act Effect a "Taking" in violation of the Fifth Amendment

■ In addition to claiming that the Coal Act violates the Due Process Clause of the

---

**15.** The Trustees are charged with the responsibility of collecting and receiving the payments

made to the Combined Fund, as well as administering the health care benefits.

Fifth Amendment, Bellaire and Allied argue that the Coal Act violates the Takings Clause of the Fifth Amendment. Before addressing Bellaire and Allied's arguments, the Court notes that "[g]iven that [plaintiff's] due process arguments are unavailing, 'it would be surprising indeed to discover' the challenged statute nonetheless violating the Takings Clause." *Concrete Pipe,* 508 U.S. at 641 (citing *Connolly,* 475 U.S. at 223). The Court further notes that all federal courts, with the exception of one, have concluded that the Coal Act does not violate the Takings Clause. *See, e.g., Davon, Inc. v. Shalala,* 75 F.3d 1114, 1127 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1709) *and* —— U.S ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (No. 95–1751) (holding that the Coal Act does not violate the Takings Clause); *Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688 (3d Cir.1996) (same); *In re Blue Diamond Coal Co.,* 79 F.3d 516, 523 (6th Cir.1996) (same); *Barrick Gold Exploration, Inc.· v. Hudson,* 47 F.3d 832 (6th Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) (same); *In re Chateaugay Corp.,* 53 F.3d 478, 491 (2d Cir.1995), *cert. denied,* 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995) (same). *But see Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818, 825 (W.D.Pa.1995) (plaintiff proved to the court's satisfaction that if it were required to make the payments to the Combined Fund, the company would be driven into bankruptcy).

The parties agree that the appropriate standard to determine whether economic legislation violates the Takings Clause is based upon "ad hoc, factual inquires into the circumstances of each particular case." *Connolly v. Pension Guaranty Benefit Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Supreme Court has identified three factors to be "of particular significance" to this inquiry: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Connolly,* 475 U.S. at 225 (quoting *Penn Central*

*Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. ·2646, 57 L.Ed.2d 631 (1978)).

### a. Character of the Governmental Action

In determining whether the Coal Act violates the Takings Clause, the Court first addresses the third *Connolly* factor, the character or nature of the governmental action. With respect to this factor, Bellaire and Allied claim that the Coal Act divests them of each and every right associated with the property that it requires them to turn over to the Combined Fund. They also claim that the Coal Act benefits only a closed, and extremely narrow, class of individuals—not retirees generally, or mineworkers generally, or even retired mineworkers generally, but only retired mineworkers once represented by UMWA and receiving health benefits as of a specified preenactment date. This fact, Bellaire and Allied argue, violates a bedrock principle of takings jurisprudence—that a statute cannot "tak[e] property from A and giv[e] it to B." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798).

As an example of this principle, Bellaire and Allied cite *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), in which the Supreme Court held that Pennsylvania's Kohler Act effected a taking because that statute "merely involve[d] a balancing of the private economic interests of coal companies against the private interests of the surface owners." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 487, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (discussing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). Bellaire and Allied argue that, like the Kohler Act, the Coal Act is unsupported by the broader health and safety justifications held to weigh against the existence of a taking in *Keystone.* Bellaire and Allied conclude that the existence of a taking in this case follows a *fortiori* from *Pennsylvania Coal:* if a legislature cannot effect an uncompensated, purely economic ·transfer from coal companies to surface owners, then it surely cannot effect an uncompensated, purely economic transfer from coal companies who once signed a particular agreement to retired miners who are receiving benefits from a particular fund.

The Court disagrees with Bellaire and Allied that the nature of the governmental action supports their claim that the Coal Act violates the Takings Clause. First, the Court finds Bellaire and Allied's attempt to analogize this case to *Pennsylvania Coal* unpersuasive. Bellaire and Allied ignore the similarities between the nature of the governmental action in MPPAA and the Coal Act when they attempt to portray the Coal Act as implementing a private economic transfer between NBCWA signatories and retired miners prohibited by the Takings Clause in *Pennsylvania Coal.*

Second, this case does not involve the physical occupation of plaintiffs' property—an area where courts have been more likely to find a taking. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488 n. 18, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ("[I]t is well settled that a taking may more readily be found when the interference with property can be characterized as a physical invasion by the government, ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (quoting *Penn Central,* 438 U.S. at 124)).[16] The governmental action at issue here requires assigned operators to pay a share of the costs for the provision of health care benefits to UMWA retirees. The Coal Act does not result in a physical invasion on any of plaintiffs' property. Rather, the Coal Act represents a reasonable Congressional response to a health care crisis in the coal industry which threatened to deprive retirees of their promised lifetime benefits. Thus, the first factor, the nature of the governmental action at issue, weighs against a judicial finding of an unconstitutional "taking."

#### b. Severity of Economic Impact

In determining whether the Coal Act violates the Takings Clause, the Court must also evaluate the economic impact of the regulation on Bellaire and Allied. Bellaire and Allied claim that the Coal Act requires total payments to the Combined Fund of $110 million and $50 million, after-tax, respectively. This figure is based on Bellaire and Allied's estimation that they will have to provide benefits to 1400 and 770 "orphans," respectively. Bellaire argues that this figure represents over nine times the value of the benefits it had contracted to provide.[17]

Federal defendant and Trustees concede that, as with the MPPAA withdrawal liability provisions, "there is no doubt that the [Coal Act] completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability." *Connolly,* 475 U.S. at 225. They contend, however, that Bellaire and Allied's liability under the Coal Act is "not made in a vacuum." *Id.* They note that each assigned operator's liability to the Combined Fund depends on the number of its former employees who are receiving benefits from the Fund. They further note that while operators may have to bear some of the costs of providing benefits to orphans whose former employers are no longer in business, the Coal Act contains provisions that substantially reduce—and might even eliminate—this burden.

The Court agrees that Bellaire and Allied's costs may be offset. The Act requires the transfer of $210 million a year for each of the first three plan years from the overfunded 1950 UMWA Pension Plan to the Combined Fund. 26 U.S.C. § 9705(a)(1). The Act also provides for the interest from the Abandoned Mine Reclamation Fund (AMR) to be transferred to the Combined Fund until the year 2004. 30 U.S.C. § 1232(b), (h). The Act mandates that all but the first $70 million of this amount be used to offset the assigned operators' costs for providing benefits to orphan retirees. *Id.* § 9705(a)(3)(B). The

16. Defendants also argue that this fact makes the Coal Act indistinguishable from the MPPAA which the *Connolly* and *Concrete Pipe* cases also rejected the takings clause challenges.

17. Federal defendant and Trustees vigorously dispute these figures on the grounds that it is not clear whether Bellaire and Allied adjusted these numbers to their present value and also failed to provide an explanation of the methodology that was used in calculating these figures. Moreover, federal defendant and Trustees note that the exact numbers of "orphans" to be assigned to Bellaire and Allied can not be determined until the final assignment process is completed by the Secretary.

Combined Fund estimates that these pension fund and AMR Fund transfers will be sufficient to pay for the benefits of *all* of the unassigned beneficiaries in the Combined Fund. Federal defendant and Trustees note, however, that even if these funds do not cover all orphan benefits, the funds will reduce the liabilities owed by Bellaire and Allied.

In assessing the severity of the economic impact between the plan and the employer's liability, the Court must examine the extent to which the liability imposed on the employer will be "out of proportion to its experience with the plan." *Connolly*, 475 U.S. at 226; *see also In re Chateaugay Corp.*, 53 F.3d at 494 ("Where a regulation mandates contributions to a benefit fund, the proper yardstick of economic impact is that of proportionality.").

In the Court's view, this factor also weighs against finding an unconstitutional "taking" for two reasons. First, plaintiffs' liability is not out of proportion to its past experience with the Trusts. As the court in *In re Chateaugay Corp.* stated:

[T]he employment relationship supplies the rational link by which [Plaintiffs'] premiums are tied to its past experience with the benefit plans. As with other signatory operators, the size of [Plaintiffs'] annual contribution depends entirely on the number of its former employees receiving benefits from the Combined Fund. By thus mooring a given company's funding obligations to a legitimate measure of its prior benefit from the UMWA health care system, the Coal Act rationally apportions future financial responsibility according to past participation. Consequently, we are not confronted with a case of Congress "forcing some people alone to bear the public burdens which, in all fairness and justice should be borne by the public as a whole."

53 F.3d at 494 (citing *Penn Central*, 438 U.S. at 123–124). Second, the Coal Act, as in *Connolly*, has provided a built-in mechanism, by way of the transfers, to offset the costs of providing health care to orphans.[18]

### c. Reasonable Investment–Backed Expectations

In determining whether the Coal Act violates the Takings Clause, the Court must also evaluate "the extent to which the regulation has interfered with distinct investment-back expectations." *Connolly*, 475 U.S. at 225. With regard to this factor, Bellaire and Allied first argue that their expectations rest on the express terms of the NBCWAs that they signed and on judicial interpretations of those agreements. Bellaire and Allied argue that health benefit obligations expired with the expiration of the underlying term. They contend that they satisfied all their NBCWA obligations under those agreements.

The Supreme Court addressed this precise argument in *Connolly*. The Supreme Court explained that:

Contracts .... cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

If the regulatory statute is otherwise within the power of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys · existing contractual rights does not always transform the regulation into an illegal taking.

*Connolly*, 475 U.S. at 223–24 (internal citation omitted).Thus, Bellaire and Allied's first argument must fail.

Bellaire and Allied also argue that by 1992 they had a reasonable expectation that their obligations to provide health benefits were fully discharged. The Court is similarly unpersuaded by this argument. Although Section XX(d) of the 1978 NBCWA (and each successor NBCWA) stated that signatory operators had to contribute to the 1950 Benefit Trusts at a specified rate for the duration of the NBCWA, Bellaire and Allied ignore Sec-

---

18. The Court also notes that plaintiffs are not claiming, as plaintiff did in *Unity Real Estate Co. v. Hudson*, 889 F.Supp. 818 (W.D.Pa.1995), that their contributions will force them into bankruptcy, or wreak any other similar havoc on the financial stability of the companies.

tions XX(b) and XX(c)(2) of those agreements which incorporated the "evergreen clauses" of the 1950 and 1974 Benefit Trusts. In addition, Bellaire and Allied attempt to ignore this Circuit's recent holding in Pittston, that these "evergreen clauses unambiguously oblige[d] signatory employers to contribute to the trusts at the rates specified in the current NBCWA, irrespective of the employer's failure to sign that NBCWA." 984 F.2d at 473. Moreover, Bellaire and Allied should have foreseen the regulation of the Benefit Trusts given the fact that the economic stability in the coal industry has long been a major concern to the federal government.

Finally, plaintiffs' contention that the obligation to provide health benefits expired at the end of the NBCWA term is belied by the fact that the 1978 NBCWA provided that a retired or disabled miner receiving a pension from the 1950 Pension Fund is "entitled to receive health benefits until death," and his widow is "entitled to receive health benefits until her death or remarriage." 1978 NBCWA. Furthermore, the 1978 NBCWA provided that any pensioner receiving benefits from the 1974 Pension Plan "will be entitled to retain his Health Services card for life," and that "[u]pon his death, his widow will retain a Health Services card until her death or remarriage." *Id.* Similar language was included in the 1981, 1984, and 1988 NBCWAs. The Court's sentiment is aptly reflected in the following:

In light of the fact that [plaintiffs] benefitted enormously from the Wage Agreements, from the labor of its former employees, and from the promise of lifetime health benefits that in part attracted them, any interference wrought by the Coal Act with [plaintiffs'] expectations was interference with unreasonable, not reasonable, expectations.

*In re Chateaugay Corp.,* 53 F.3d at 495–96. Thus, this factor also does not weigh in favor of finding an unconstitutional "taking." This Court, therefore, concludes that the Coal Act does not violate the Fifth Amendment's Takings Clause with respect to Bellaire and Allied.[19]

## IV. APPLICATION OF THE COAL ACT TO ABC

Having concluded that the Coal Act passes constitutional muster, the Court now addresses ABC's primary claim that the Department of Health and Human Services Secretary's application of the Coal Act to its member companies was arbitrary and capricious and should, therefore, be held unlawful and set aside under the APA.[20] ABC contends that the Coal Act does not apply to its member companies because they are not "signatory operators" as that term is defined in the Coal Act and, thus, ABC claims the assignment of beneficiaries to its members was arbitrary and capricious under the Administrative Procedure Act (APA).[21]

---

19. It appears, from AECI's reply to Defendants' oppositions to its motion for summary judgment, that AECI is no longer pursuing its takings challenges to the Coal Act. In its reply, AECI stated that:

> [t]he remaining issues are narrow: (1) whether 26 U.S.C. § 9704(i)(1)(A), which requires AECI to contribute to the Combined Fund to alleviate costs incurred during its first fiscal year, violates the Fifth Amendment Due Process Clause; and (2) whether 26 U.S.C. § 9712(d), which requires AECI to pay premiums to the 1992 Benefit Plan, likewise violates the Fifth Amendment's Due Process Clause.

AECI's Rep. to Def. Opp. at 4. Moreover, AECI did not advance any takings arguments in its motion for summary judgment. To the extent that AECI still pursues its takings arguments, for the same reasons as discussed above with respect to Bellaire and Allied Taking Clause challenge, AECI's challenge must fail.

20. ABC's secondary due process argument was addressed in the preceding section of this Opinion.

21. As a threshold issue, the federal defendant asks the Court to resolve the issue of whether ABC may bring this action on behalf of its member companies. According to the federal defendant, all ABC members have not given affirmative authorization to bring this action on their behalf. Of approximately 100 current members, 14 members and former members have received assignments under the Coal Act. Thus, the federal defendant asks that ABC be directed to provide sufficient proof that it has in fact been authorized to commence this action challenging the assessment of premiums on behalf of its members, and that the subject matter of this action—the liability of the assigned operators—is sufficiently germane to its stated limited purposes, involving negotiating collective bargaining agreements with UMWA on coal mine construction.

ABC is a nonprofit, multiemployer association whose members are construction contractors performing work for coal mining companies. Created in 1968, ABC's main purpose is to act as a collective bargaining agent for its members' construction contractors in negotiating agreements with the UMWA. ABC seeks a declaratory judgment that the Coal Act does not apply to its members, and seeks injunctive relief to prevent the enforcement of the Act against them.

The Secretary's decision to assign beneficiaries to ABC's members pursuant to the Coal Act is a final agency decision and, hence, reviewable under the APA. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). The APA provides that final agency action shall be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

In claiming that application of the Coal Act to its member companies was arbitrary and capricious, ABC first notes that before a person can be liable for paying premiums to the Combined Fund, that person must be an "assigned operator" within the meaning of the Coal Act. An "assigned operator" is a "signatory operator" to which liability is assigned under the Act. 26 U.S.C. § 9701(c)(5). Thus, before a person can be an "assigned operator," they must first satisfy the definition of "signatory operator." ABC argues that its members are not signatory operators and, therefore, cannot be assigned operators subject to liability under the Coal Act. Accordingly, the final issue to be resolved is whether the ABC member companies are signatory operators within the meaning of the Coal Act.

"Signatory operator" is defined by section 9701(c)(1) as "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. 9701(c)(1). "Coal wage agreement" is defined by section 9701(b)(1), which provides:

The term "coal wage agreement" means—

(A) the National Bituminous Coal Wage Agreement, or

(B) any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required or requires one or both of the following:

(i) the provision of health benefits to retirees of such employer, eligibility for which is based on years of service credited under a plan established by the settlors and described in section 404(c) or a continuation of such plan; or

(ii) contributions to the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, or any predecessor thereof.

26 U.S.C. 9701(b)(1).

ABC contends that its members were never signatories to an NBCWA, as set forth in section 9701(b)(1)(A), or to any other coal wage agreement, as set forth in section 9701(b)(1)(B) and, therefore, are not "signatory operators" to which liability under the Coal Act may be assigned.

### A. NBCWA

■ In arguing that its members are not signatory operators, ABC first claims that its members were not signatories to a NBCWA, which is a collective bargaining agreement negotiated between the BCOA and the UMWA. 26 U.S.C. § 9701(b)(3).

ABC acknowledges that it negotiated collective bargaining agreements with UMWA, but maintains that these agreements are not NBCWAs. ABC negotiated the following collective bargaining agreements with the UMWA: the Construction Work Addendum to the National Bituminous Coal Wage Agreement of 1968, effective October 1, 1968; the National Coal Mine Construction Agreements effective January 16, 1972, December 23, 1974, April 6, 1978, June 25, 1981, February 9, 1985, November 21, 1988, October 1, 1991; and the Alternate National Coal Mine

---

ABC asserts that it has standing to maintain this action on behalf of its members because ABC's pursuit of this lawsuit was duly authorized by the Board of Directors. In addition, ABC has attached to its Opposition to the Motions for Summary Judgment, documents that, in the Court's view, address satisfactorily the federal defendant's concerns.

Construction Agreement effective November 21, 1988.

The 1968 and 1972 agreements explicitly incorporate by reference the then-current NBCWA. The Construction Work Addendum to National Bituminous Coal Wage Agreement of 1968 provided: "All provisions of the NBCWA of 1968 which are applicable to such construction work will prevail except those inconsistent with those below." The National Coal Mine Construction Agreement, effective January 1972, provided: "This agreement is a supplement to the National Bituminous Coal Wage Agreement of 1971 and all the provisions of that agreement which are applicable to such construction work will prevail except those inconsistent herewith."

ABC argues that despite the reference to the NBCWA in the 1968 and 1972 agreements, the ABC agreements are not NBCWAs, but are separate, standalone agreements which do not render its member companies signatories to the incorporated NBCWA. ABC emphasizes that the ABC agreements were not negotiated between the BCOA and the UMWA, as required under the definition of NBCWA, but rather were negotiated between ABC and the UMWA. ABC contends that the NBCWAs were used in the first two ABC agreements primarily as a model. ABC further notes that the decision to incorporate the terms of the NBCWAs was a decision made by ABC.

Federal defendant and Trustees argue that through the execution of the 1968 and 1972 agreements, the ABC member companies agreed to be governed by the relevant terms of the NBCWAs and, thus, became signatories of the NBCWAs through their agreement with UMWA. The federal defendant characterizes the companies that were member companies of ABC, when ABC executed the 1968 and 1972 agreements with UMWA, as "me, too" companies under the referenced 1968 and 1971 NBCWAs. The federal defendant also notes that when ABC signed the 1968 agreement, employees of its member companies were given the benefits of the 1950 Trust, although ABC was not required to make contributions because contributions were based on tonnage and ABC did not mine coal. The federal defendant further notes that the member companies continued to participate in the 1950 Fund during the term of the 1972 agreement.

While the 1968 and 1972 ABC agreements clearly referenced the NBCWAs, the Court is persuaded by ABC's argument that this is not sufficient to render the ABC agreements themselves NBCWAs, or to render the ABC member companies "me, too" companies under the referenced NBCWAs. The Court is also persuaded that the NBCWAs referenced in the ABC agreements did not have the effect of having the ABC members governed under the NBCWAs in the same way as the coal miner, but rather were referenced as models. In support of this conclusion, the Court notes that, since the expiration of the 1968 Agreement, ABC has negotiated a series of National Coal Mine Constructions Agreements. These agreements do not fall within the Coal Act's definition of NBCWA. Thus, the Court concludes that ABC members are not signatories to NBCWAs and are, therefore, not signatory operators under section 9701(b)(1)(A) of the Act.

### B. "Other Agreements"

Even if the 1968 and 1972 ABC agreements do not render ABC members signatories to a NBCWA, ABC members are signatory operators under the alternative provision of the Act. Subsection (B) provides that a coal wage agreement includes "any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required or requires" health benefits as specified or contributions to the UMWA Benefit Plans. 26 U.S.C. 9701(b)(1)(B). In order to satisfy the alternative definition of a "coal wage agreement," not only must the agreement be entered into with the UMWA, but the employer must be "an employer in the coal industry." ABC argues that the agreements it entered into with the UMWA do not constitute "coal wage agreements" because the ABC members are not "employers in the coal industry" within the meaning of the Coal Act.

In arguing that its members are not "employers in the coal industry," ABC contends that its members are construction companies that construct shafts and tunnels; erect

buildings, silos or other structures; build roads or rail lines; or perform other work common to the construction industry. ABC contends that because its members are in the construction business, and not in the business of mining and producing coal, they are not "employers in the coal industry." ABC contends that it was not part of the problem which led to the Trusts' insolvency and that "employer[s] in the coal industry" should, therefore, be read to exclude ADC's members.

ABC also argues that the legislative history of the Coal Act did not include any reference to construction contractors such as ABC members. ABC contends that this omission is significant in view of a long-standing Congressional awareness and recognition of the differences between coal mining and construction reflected in other statutes. ABC further contends that this omission should be interpreted to mean that employers not in the coal industry, such as construction contractors, are not meant to be included within the scope of the Coal Act.

As further support for its position, ABC notes that Congress, in enacting the Federal Mine Safety and Health Act of 1977 (MSHA), recognized the differences between the coal mining industry and the coal mine construction industry. ABC notes that section 101(a)(8) of the MSHA directed the Secretary to promulgate separate mandatory health or safety standards applicable to mine construction activity on the surface. ABC also notes that section 115(d) of the MSHA directed the Secretary to promulgate appropriate standards for safety and health training for coal or other mine construction workers. ABC further contends that the Black Lung Benefits Reform Act of 1977, likewise, maintained the distinction between mining and construction. In support of its position, ABC cites *National Independent Coal Operator's Ass'n v. Brennan*, 372 F.Supp. 16 (D.D.C.), *aff'd*, 419 U.S. 955, 95 S.Ct. 216, 42 L.Ed.2d 172 (1974), *and reh. denied*, 419 U.S. 1132, 95 S.Ct. 818, 42 L.Ed.2d 831 (1975), where a three-judge panel, apparently recognizing the differences between coal mining and construction, found that coal mine con-

struction as such does not involve the mining, processing, or extracting of coal, and coal mine construction workers are not exposed to the same health or safety hazards as workers engaged in the processing of coal.

The Court is unpersuaded by ABC's arguments. ABC concedes that the term "coal industry" is not defined in the Coal Act, and as the federal defendant and Trustees point out, ABC cites no authority to support its restrictive meaning of "coal industry." Further, ABC has submitted no authority to support the proposition that being an employer in the construction industry is mutually exclusive with being an employer in the coal industry. The Court finds ABC's attempt to distance itself from the "coal industry" disingenuous, given that the minutes from a 1974 ABC Board of Directors meeting reflects the statement "if the government takes any action to forestall or end the strike we want to make sure that we are included as part of the coal industry."[22] ABC Minutes of Board of Directors Meeting, August 12–13, 1974, at 1.

With respect to ABC's claim that the lack of reference to construction contractors, such as ABC members in the legislative history of the Coal Act, should be interpreted to mean that employers not in the coal industry, such as construction contractors, are not meant to be included within the scope of the Coal Act, the Court disagrees. If anything, this "omission" cuts against ABC's arguments. During the discussion of the Coal Act, ABC's General Counsel sent a letter to the administrative assistant to Senator Rockefeller, the chief sponsor of the Coal Act, seeking to have language inserted in the Coal Act that would have specifically excluded the "Coal Mine Construction Agreements" from the definition of "coal wage agreements." Trustees' Statement of Material Facts As to Which There Is No Dispute, ¶ 44; *Id.* Ex. 10. Notably, no such language was ever inserted into the Act. Thus, having presumably been informed of the construction industry's concern, this "omission" seems to indicate that Congress intended to include the construc-

---

**22.** Not coincidentally, the Court notes that ABC's middle name is Bituminous, which refers to a specific kind of coal.

tion industry within the ambit of the Coal Act.

Furthermore, as the court will address, Congress' intent to give a broad and expansive reading in defining the companies subject to coal industry regulation to include coal mine construction companies within the coal industry has been recognized by the courts. Subsequent to the *Brennan* decision, Congress adopted the Black Lung Benefits Reform Act of 1977, amending section 902(d) of the MSHA to provide:

> The term miner ... includes any individual who works or has worked in a coal mine construction or transportation or around a coal mine, to the extent that such individual was exposed to coal dust as a result of such employment.

Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, § 2, 92 Stat. 95, 95 (1978) (codified as amended at 30 U.S.C. § 902 (1982)). Amendments to section 802(d) of the MSHA in 1977 also adopted a more expansive definition of operator: [23]

> The term operator means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine.

Federal Mine Safety and Health Amendments Act of 1977, Pub.L. 95–164, ¶ 102(b), 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. § 802). The amendment also defined "mine" to include lands, excavations, shafts, slopes, and other property, including impoundments, retention dams, and tailing ponds. *Id.* (codified as amended at 30 U.S.C. § 802(h)(1)). In *Bituminous Coal Operators' Ass'n v. Hathaway,* 406 F.Supp. 371 (W.D.Va.1975), *aff'd, Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d 240 (4th Cir.1977), the court found that mine construction work is a specialized branch of the construction industry, that the use of such companies is common in the coal mining industry, and that employees of these companies often face safety hazards similar to those faced by miners. ABC made the

argument in the *Hathaway* case that construction activity was not, at all, intended to be encompassed by the MSHA. *Hathaway,* 406 F.Supp. at 375. On appeal, the Fourth Circuit recognized that the safety and health standards of the Act applied to work performed by members of ABC and that this application was "soundly based on the broad definition of coal mine." *Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d at 245. The circuit court also noted that the MSHA's provisions "do not expressly exempt construction companies from coverage," and that construction employees share the risks to which miners are exposed. *Id.*

In *Association of Bituminous Contractors, Inc. v. Andrus,* 581 F.2d 853 (D.C.Cir.1978), the District of Columbia Circuit upheld the ruling of the Secretary that an independent company engaged to do construction work at a coal mine was an "operator of a coal mine." *Id.* at 860–63. Further, in *Otis Elevator Co. v. Secretary of Labor,* 921 F.2d 1285, 1290 (D.C.Cir.1990), the District of Columbia Circuit held that the amendment extending the definition of operator to any independent contractor performing services at a mine were words of inclusion, not exclusion.

Moreover, the Court is persuaded by the arguments of the federal defendant and Trustees that there was no necessity for Congress to single out coal mine construction as a component of the coal industry in defining coal wage agreements because its inclusion is plain from the comprehensive, expansive nature of the coal industry itself.[24] They note that the Keystone Coal Industry Manual, the authoritative publication of the coal industry, has included ABC in its list of Coal Industry Organizations. ABC is similarly classified as such in the Encyclopedia of Organizations. In view of the foregoing, it is the opinion of the Court that ABC's member companies are "employer[s] in the coal industry."

---

**23.** Federal defendant and Trustees argue that the MSHA formerly defined an operator as "any owner, lessee, or other person who operates, controls, or supervises a mine." 30 U.S.C. § 802(d) (1970).

**24.** Federal defendant and Trustees also note that without the work performed by construction coal mine companies the coal could not be mined at all and, thus, the construction companies are part of the industry.

Having determined that the ABC members are employers in the coal industry, the Court must next determine if any of the agreements entered into required either (1) the provision of health benefits to retirees of such employer, eligibility for which is based on years of service credited under a plan established by the settlors and described in section 404(c) or a continuation of such plan, or (2) contributions to the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, or any predecessor thereof. 26 U.S.C. § 9701(b)(1)(B)(i), (ii).

ABC concedes that commencing in 1974, UMWA demanded that ABC agree to the same hourly contribution structure with respect to the newly-created 1974 Plans, as that included in the UMWA/BCOA agreements.[25] ABC members made contributions under the 1974 agreement, but negotiated an end to the obligation to contribute to the 1974 Benefit Fund in the next agreement. In the 1978 agreement, ABC members were required to make contributions to the 1974 Benefit Fund from the agreement's effective date, April 6, 1978 until May 31, 1978. After May 31, 1978, ABC's members' only remaining obligation consisted of contributing to the 1974 Pension Trust. In 1985, this obligation ceased when all assets and liabilities attributable to participation of construction workers in 1974 were transferred to the newly-created UMWA 1985 Construction Workers Pension Plan, and they never had any subsequent obligation to contribute to the 1974 Trust. As part of the 1978 ABC agreement, all construction workers who were identified with ABC members and who were receiving benefits from the 1974 Trust[26] were transferred to the newly-created 1978 Retired Construction Workers Benefit Trust (RCWBT). To this day, ABC members continue to provide benefits to their retired UMWA construction workers and their families under this separate plan.

Because the 1974 and 1978 ABC agreements required contributions until May 31, 1978 to the 1974 Trusts, they satisfy the definition of "any other agreement" under subsection (B)(ii). In addition, ABC's eligible members were receiving benefits from the 1950 Trust for more than 20 years, even though ABC's members never contributed to the Trust. Moreover, ABC's members received benefits from the 1974 Trust during the period from 1974 through 1978.

The Court concludes, therefore, that the National Coal Mine Construction Agreements are coal wage agreements, pursuant to 26 U.S.C. § 9701(b)(1)(B)(ii), because these agreements were entered into between ABC member companies, which are "employer[s] in the coal industry," and the UMWA, and these agreements required contributions to the 1974 Trust. Thus, ABC's members are "signatory operators" within the meaning of the Coal Act, and the Secretary's decision to assign ABC's members beneficiaries is not arbitrary or capricious under the APA.

## CONCLUSION

For the reasons set forth herein, the Court concludes that the Coal Act as applied to each of the plaintiffs does not violate either the Due Process or the Takings Clauses of the Fifth Amendment. The Court also concludes that the Secretary of the Department of Health and Human Services did not abuse her discretion in applying the Coal Act to ABC. Accordingly, defendants' motions for summary judgment shall be **GRANTED,** and plaintiffs' motions for summary judgment shall be **DENIED.**

---

**25.** ABC also states that, during the negotiations for the 1972 agreement, ABC was aware that employees of ABC members were receiving benefits from the 1950 Trust, even though ABC members did not make Trust contributions. ABC's Statement of Material Facts Not in Dispute, ¶ 29.

**26.** Federal defendant and Trustees stress that the fact that ABC members were able to receive benefits from the Trusts further buttresses defendants' argument that ABC is "an employer in the coal industry."