171 F.3d 1052
 23 Employee Benefits Cas. 1096
 DIXIE FUEL COMPANY, Plaintiff-Appellant,
v.
COMMISSIONER OF SOCIAL SECURITY; Darrell Blevins, Social
Security Freedom of Information Act Officer;
Kenneth S. Apfel, Commissioner,
Defendants-Appellees.
 No. 97-6099.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 22, 1998.
Decided March 25, 1999.
 
 H. Kent Hendrickson (argued and briefed), Rice & Hendrickson, Harlan, KY, for Plaintiff-Appellant.
 David E. Middleton, Asst. U.S. Attorney (argued and briefed), Office of U.S. Attorney, Lexington, KY, for Defendants-Appellees.
 Before: WELLFORD, NORRIS, and BATCHELDER, Circuit Judges.
 BATCHELDER, Circuit Judge.
 
 
 1
 Plaintiff Dixie Fuel Company ("Dixie Fuel") appeals from the order of the district court denying its motion for a temporary restraining order, and preliminary and permanent injunctive relief to prevent the Social Security Administration ("SSA") from assigning beneficiaries under the Coal Industry Retirement Health Benefit Act ("Coal Act"), 26 U.S.C.A. §§ 9701-9722 (West Supp.1998), to Dixie Fuel. For the reasons enumerated below, we find that the district court erred in denying Dixie Fuel's motion for injunctive relief and thus, we reverse.
 
 I. THE COAL ACT
 
 2
 In 1992, Congress enacted the Coal Act in an attempt to create additional financing for the health benefits fund of the United Mine Workers of America ("UMWA"). Under the Coal Act, the Social Security Administration was responsible for "assigning" eligible UMWA retirees and their dependants to current and former signatory coal operators[1] (or "related persons"[2]) in accordance with the criteria set forth at 26 U.S.C. § 9706.[3] The statute specifies that "the Commissioner of Social Security shall, before October 1, 1993," make these assignments. 26 U.S.C. § 9706(a).
 
 
 3
 Those companies which have been assigned beneficiaries by the SSA ("assigned operators") are required to pay premiums for these beneficiaries directly to the UMWA Combined Benefit Fund. 26 U.S.C. § 9704. Beneficiaries not assigned to a signatory operator or related company go into the "unassigned pool." 26 U.S.C. § 9704(d). After exhaustion of specifically designated funds,[4] the premiums for the miners in the unassigned pool will be assessed proportionally against all assigned operators. 26 U.S.C. § 9704(d).
 
 
 4
 Under the Coal Act, if an assigned operator believes that it has been assigned beneficiaries in error, it may obtain information about the beneficiaries from the SSA and seek review of the assignment. 26 U.S.C. § 9706(f); see also 20 C.F.R. §§ 422.601-607. The burden is on the assigned operator to make out a prima facie case that the assignments were in error. See 20 C.F.R. § 422.605. The Commissioner then reviews the assignments; if he determines that the assignments were in error, he has the authority to declare them void and to reassign the beneficiaries to the appropriate signatory operator or related entity. 26 U.S.C. § 9706(f)(3)(A). If he determines that the assignments are not in error, he must notify the assigned operator. The Commissioner's determination is final. 26 U.S.C. § 9706(f)(3)(B), (f)(4).
 
 II. DIXIE FUEL COMPANY & PROCEDURAL HISTORY
 
 5
 Plaintiff-Appellant Dixie Fuel was never a signatory to the UMWA labor agreements referenced in the Act. However, the SSA has deemed Dixie Fuel to be a related company to the V & C Coal Company ("V & C"), a signatory which is no longer in existence. Since September 1995, the SSA has assigned Dixie Fuel more than fifty beneficiaries who were former employees of V & C and maintains that Dixie Fuel is responsible for these beneficiaries. Dixie Fuel has estimated its current liability based on these assignments at approximately $500,000.00, exclusive of interest and penalties. Almost all of the beneficiaries assigned to Dixie Fuel came from the "unassigned pool."[5]
 
 
 6
 Dixie Fuel sought SSA review of the assignments, and has made requests under the Freedom of Information Act ("FOIA") to gain information in support of its request. In order to submit further information in support of its challenge to these assignments, Dixie Fuel has requested extensions of time in the review process.
 
 
 7
 On July 30, 1997, Dixie Fuel filed a Verified Claim in the district court for the Eastern District of Kentucky seeking declaratory and injunctive relief voiding these assignments. Contemporaneously, Dixie Fuel filed a motion for a temporary restraining order enjoining the SSA from assigning it any more beneficiaries, requiring the SSA to notify the Combined Fund that assignments to Dixie Fuel are void, and enjoining the SSA from withholding information requested by Dixie Fuel in its FOIA requests. The district court denied all injunctive relief to Dixie Fuel,[6] ruling solely that the agency's interpretation of § 9706(a) as allowing the SSA to assign beneficiaries from the unassigned pool after October 1, 1993, is reasonable and entitled to deference. Dixie Fuel now brings this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1) from the district court's denial of its motion for injunctive relief.
 
 
 8
 At oral argument, the SSA conceded that the particular assignments at issue are void under the Supreme Court's decision in Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (June 25, 1998). The SSA argued that this concession moots the issue before this Court.
 
 III. DISCUSSION
 
 9
 We will first address whether the SSA's concession at oral argument moots this appeal. Second, we will address the district court's jurisdiction over the issues below. Finally, we will consider the denial of injunctive relief.
 
 A. MOOTNESS
 
 10
 The SSA's concession at oral argument did not render this appeal moot. A party's voluntary cessation of an allegedly illegal activity does not moot the issue of whether prospective injunctive or declaratory relief is proper. City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1198 (D.C.Cir.1985) (holding that even when an administrative agency ceases illegal conduct, the case is not moot); Blinder, Robinson & Co. v. United States Sec. & Exch. Comm'n, 692 F.2d 102, 106-07 (10th Cir.1982) (same); Hooker Chem. Co., Ruco Div. v. United States EPA, 642 F.2d 48, 52 (3d Cir.1981). However, "[s]uch abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." City of Mesquite, 455 U.S. at 289, 102 S.Ct. 1070.
 
 
 11
 Equally importantly, Eastern Enterprises did not address the issue that Dixie Fuel asks us to decide here. Eastern Enterprises held that the Coal Act's retroactive allocation of beneficiaries, as applied to Eastern, violates the Takings Clause of the Fifth Amendment. Eastern Enterprises, 118 S.Ct. at 2153. Dixie Fuel seeks not only to void the assignments already made to it, but to enjoin the SSA from making any new assignments, not because such assignments might violate the Fifth Amendment, but because the Coal Act does not permit the SSA to make any assignments at all after October 1, 1993.[7] The defendant who seeks to have a case dismissed as moot must demonstrate that "there is no reasonable expectation that the alleged wrongs will be repeated," Blinder, Robinson & Co., 692 F.2d at 106-07 (citing United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). Although the SSA conceded that these particular assignments to Dixie Fuel were void under Eastern Enterprises, it did not concede that it may not or would not again assign beneficiaries to Dixie Fuel. Therefore, the case is not moot and we may reach the merits of the appeal.
 
 B. DISTRICT COURT'S JURISDICTION
 
 12
 Dixie Fuel asserts that the district court had jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 552 & 702 (the Administrative Procedure Act). The SSA contends that the lower court lacked subject matter jurisdiction because Dixie Fuel has not sought a final decision by the SSA and has therefore failed to exhaust its administrative remedies. The court below did not address the challenge to its jurisdiction.
 
 1. Jurisdictional Bases
 
 13
 The district court has jurisdiction under 28 U.S.C. § 1331 to review agency actions, subject only to statutes precluding such review, see Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Administrative Procedure Act (APA), is not an independent grant of jurisdiction, see id. at 107, 97 S.Ct. 980; rather, it provides the framework for judicial review of agency actions.[8] Indeed, the Supreme Court has explained that the APA " 'embodies the basic presumption of judicial review' " available to those aggrieved by agency action. Reno v. Catholic Social Servs., Inc., 509 U.S. 43, 56-57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).
 
 
 14
 Although 28 U.S.C. § 1331 provides the statutory basis for jurisdiction, Dixie Fuel still must demonstrate that its claims are ripe for adjudication and, if appropriate, that it has exhausted its administrative remedies.
 
 2. Ripeness
 
 15
 The district court is limited by Article III, § 2 of the U.S. Constitution to the adjudication of actual cases or controversies. Thus, the exercise of jurisdiction requires that the case be ripe for review. The ripeness doctrine exists to ensure that courts decide "only existing, substantial controversies, not hypothetical questions or possibilities." City Communications, Inc. v. City of Detroit, 888 F.2d 1081, 1089 (6th Cir.1989).
 
 
 16
 Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Even in the absence of final agency action, a case may be considered ripe when there is no compelling judicial interest in deferring review. The court should consider whether the issues are fit for judicial decision as well as the hardship to the challenging party resulting from potential delay in obtaining judicial decision. Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); Abbott Lab., 387 U.S. at 149, 87 S.Ct. 1507, overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); see also Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n, 68 F.3d 503, 508 (D.C.Cir.1995).
 
 
 17
 "Under the fitness prong ..., we are to consider the nature of the challenged issue and inquire whether the agency action is sufficiently final for review.... When a petitioner 'raises a purely legal question,' we assume that issue is suitable for judicial review." Mississippi Valley Gas Co., 68 F.3d at 508 (citations omitted); see also Thomas, 473 U.S. at 581, 105 S.Ct. 3325 ("The issue presented in this case is purely legal, and will not be clarified by further factual development.")
 
 
 18
 The Coal Act provides that challenged assignment decisions become final after review by the Commissioner of Social Security and notice to the assigned operator of the Commissioner's determination. 26 U.S.C. § 9706(f)(4). However, one court notes that "[t]he Secretary's decision to assign beneficiaries to [a signatory or related person] pursuant to the Coal Act is a final agency decision and hence, reviewable under the APA." Bellaire Corp. v. Shalala, 995 F.Supp. 125, 145 (D.D.C.1997). We recognize that Dixie Fuel filed this action before the review by the Commissioner was complete. However, whether the SSA has the statutory power to assign beneficiaries after October 1, 1993, is a "purely legal question" on which the Commissioner has taken a clearly defined position; there is no indication that the SSA intends to reconsider this question of law in any further administrative action. To require Dixie Fuel to obtain a final agency decision under these circumstances would impose substantial hardship, since Dixie Fuel must either continue to pay the premiums attributable to the challenged assignments or incur the penalties for failure to make those payments. 26 U.S.C. §§ 9706(f)(5), 9707. In this case, as in Thomas, "[n]othing would be gained by postponing a decision." Thomas, 473 U.S. at 582, 105 S.Ct. 3325. We hold that the Commissioner's decisions assigning beneficiaries to Dixie Fuel are judicially reviewable under the APA.
 
 3. Exhaustion of Administrative Remedies
 
 19
 The Commissioner contends that even if the assignments of beneficiaries to Dixie Fuel are considered final decisions under the APA, the federal court lacks jurisdiction over this matter because Dixie Fuel has not exhausted the administrative remedies provided in § 9706(f). Dixie Fuel counters that its challenge is to the purely legal issue of the Commissioner's statutory authority to make assignments after October 1, 1993, and, in any event, the Coal Act does not contain a comprehensive review process sufficient to permit Dixie Fuel to obtain a genuine review of this legal issue.
 
 
 20
 Under the doctrine of exhaustion of administrative remedies, a party is not entitled to judicial relief for an actual or threatened injury until the requisite administrative remedies have been exhausted. See, e.g., McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (citing Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938)). However, the Supreme Court has long held that, at least in non-APA cases, the exhaustion requirement is far from absolute. "Of 'paramount importance' to any exhaustion inquiry is congressional intent. Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (internal citations omitted).
 
 
 21
 It was not until Darby v. Cisneros, 509 U.S. 137, 144-54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) that the Supreme Court addressed the issue of whether a litigant who seeks judicial review of agency action under the APA must first exhaust all administrative remedies. In Darby, the Court held that in actions brought under the APA, the courts lack discretion to require exhaustion unless it is "expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." Id. at 154, 113 S.Ct. 2539. The Court pointed out that "[a]lthough § 10(a) [5 U.S.C. § 702] provides the general right to judicial review of agency actions under the APA, § 10(c) [5 U.S.C. § 704[9] establishes when such review is available." Id. at 146, 113 S.Ct. 2539. "While federal courts may be free to apply, where appropriate, other prudential doctrines of judicial administration to limit the scope and timing of judicial review, § 10(c), by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates." Id. Darby also made the point that "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality," id. at 144, 113 S.Ct. 2539.
 
 
 22
 [T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.
 
 
 23
 Id. (citation omitted).
 
 
 24
 The Coal Act does not specifically require exhaustion of remedies before judicial review. See 26 U.S.C. § 9706(f)(2). At most, the Act provides an avenue that an assigned operator may take to obtain review of the factual basis for the assignment of particular beneficiaries. The regulations promulgated to implement the Coal Act similarly contain no mandate of exhaustion of remedies before an aggrieved assigned operator may seek judicial review of the assignment of beneficiaries. The Act does specifically require that "an assigned operator pay the premiums [for its assigned beneficiaries] pending review by the Commissioner of Social Security or by a court under this subsection." 26 U.S.C. § 9706(f)(5).
 
 
 25
 We have already held that the decision of the Commissioner assigning these beneficiaries to Dixie Fuel was a final decision. We hold further that because this action was brought under the APA, and because the Coal Act and its attendant regulations do not mandate exhaustion of remedies and do not provide that the Commissioner's decision is "inoperative" pending appeal, the district court did not have discretion to require Dixie Fuel to exhaust its administrative remedies before pursuing this action.
 
 
 26
 Accordingly, we hold that the district court's exercise of jurisdiction in this action was proper.
 
 C. DENIAL OF INJUNCTIVE RELIEF
 
 27
 In deciding whether to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest. Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir.1998) (citing Golden v. Kelsey-Hayes Co., 73 F.3d 648, 653 (6th Cir.1996)). "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." International Longshoremen's Ass'n, Local 1937 v. Norfolk Southern Corp., 927 F.2d 900, 903 (6th Cir.1991).
 
 
 28
 Ordinarily, the scope of our review of a district court's denial of a preliminary injunction is limited to determining whether that court abused its discretion in finding that the plaintiff likely would not prevail on the merits and in finding insufficient harm to the plaintiff and harm to the defendant and to the public interest. Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). We will reverse the district court only if we find that it "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard," Connection Distrib. Co., 154 F.3d at 288, and we review the district court's conclusions of law de novo and findings of fact for clear error, Golden, 73 F.3d at 653.
 
 
 29
 The Supreme Court, however, has held that this approach, although it is the norm, is not absolute. Thornburgh, 476 U.S. at 756-57, 106 S.Ct. 2169. In that case, the Court explained that "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." Id. at 757, 106 S.Ct. 2169. The Court went on to approve the Court of Appeals' plenary review as to the applicable law, holding "[t]hat a court of appeals ordinarily will limit its review in a case of this kind to abuse of discretion is a rule of orderly judicial administration, not a limit on judicial power." Id.
 
 
 30
 This circuit, in United States v. State of Michigan, 940 F.2d 143 (6th Cir.1991) has addressed this issue as well:
 
 
 31
 This court has also recognized the scope of appellate jurisdiction over issues involving injunctive relief:
 
 
 32
 It is elementary that an appeal from the denial of injunctive relief brings the whole record before the appellate court and that the "scope of review may extend further [than the immediate question on which the District Court ruled] to allow disposition of all matters appropriately raised by the record, including entry of final judgment."
 
 
 33
 Id. at 151-52 (alterations in original) (citations omitted).
 
 
 34
 In the case before us, the issue is the purely legal question of whether the statute permits the SSA to make any assignments after October 1, 1993. If the statute does not, then Dixie Fuel is entitled, not only to a preliminary injunction, but a permanent one, at least with regard to any initial assignments of beneficiaries to Dixie Fuel after that date. Accordingly, we will proceed with plenary review of this issue.
 
 
 35
 The statute at issue reads, in pertinent part: "For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator...." 26 U.S.C. § 9706(a) (emphasis added).
 
 
 36
 The SSA has made two arguments over the course of this action justifying its assignment of beneficiaries to Dixie Fuel after October 1, 1993. First, SSA claimed in its Response to the Plaintiff's Motion for a Temporary Restraining Order, that unassigned beneficiaries are considered "assigned" to the unassigned pool under the meaning of the Act; thus, any assignments to Dixie Fuel after the October 1, 1993, date were actually "reassignments" under the Act. Dixie Fuel admits that the SSA has statutory authority under 26 U.S.C. § 9706(f)(3)(A)(ii) to make reassignments after October 1, 1993. This argument is unsupported by the SSA's own regulations: "Assignment means our selection of the coal operator or related person to be charged with the responsibility of paying the annual health and death benefit premiums of certain coal miners and their eligible family members." 20 C.F.R. § 422.602. Clearly, no such selection occurs when the beneficiary remains "unassigned." Apparently, however, the SSA abandoned this argument in its Supplemental Memorandum to the district court and in its brief to this Court, in which the SSA admits: "The 'unassigned pool,' by its name alone, demonstrates that its members have not been assigned." Appellee's Br. at 15 n. 2 (emphasis added).
 
 
 37
 The second argument, while not mentioned in the original Response to Dixie Fuel's Motion for a T.R.O., was set forth in the Supplemental Memorandum to the district court as well as in the SSA's brief to this Court. The SSA argues that the October 1, 1993 date contained in the statute is not a jurisdictional mandate, but merely a direction to "spur the SSA into prompt action." Dixie Fuel, of course, asserts that the language of the statute, the legislative history, and congressional intent reflect that the date in the statute was meant to be and has been understood as a mandate terminating the SSA's authority to assign beneficiaries.
 
 
 38
 The district court concluded, inter alia: (1) the interpretation of a statute by the agency charged with executing provisions of the statute is entitled to deference; (2) a statutory direction to an agency to carry out action within a fixed time does not limit the authority of the agency after that time absent express language; and (3) the agency's power to assign these miners to Dixie Fuel is consistent with congressional intent. The district court did not consider whether the language of the statute plainly evidenced congressional intent, a prerequisite to deciding whether an agency's interpretation should be accorded deference. See Chevron v. National Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 39
 When reviewing an agency's construction of a statute that the agency is empowered to administer, this court must ask the Chevron questions: First, has Congress spoken directly to the precise issue? If Congress has directly spoken, then we must give effect to the unambiguously expressed intent of Congress. However, if the statute is silent or ambiguous on the issue, then is the agency's interpretation a permissible construction of the statute? Id.
 
 
 40
 The language of 26 U.S.C. § 9706(a) is plain on its face: "The Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree ... to a signatory operator which (or any related person with respect to which) remains in business...." The Supreme Court has held in any number of contexts that "shall" is "explicitly mandatory" language. See, e.g., United States v. Monsanto, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) ("Congress could not have chosen stronger words [than 'shall order forfeiture'] to express its intent that forfeiture be mandatory...."); Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 534 n. 15, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (contrasting omission of mandatory language in preamble of Hague Conference on Private International Law with use of mandatory language ("The present Convention shall apply ...") in preamble of Hague Service Convention); Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("[The Commonwealth] has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" with regard to placing inmate in administrative segregation.), abandoned on other grounds, Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947) ("The word 'shall' is ordinarily 'The language of command.' ") However, the Court has also held that "the mere use of the word 'shall' ... standing alone" was not sufficient to terminate the power of the Secretary of Labor to recover misused funds after the expiration of the statutory period within which the Secretary was to act. Brock v. Pierce County, 476 U.S. 253, 262, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).[10]
 
 
 41
 The use of the word "shall" in 26 U.S.C. § 9706(a) is not a "mere use ... standing alone." Id. No provision of the Coal Act so much as hints that the October 1, 1993, date is not a deadline. To the contrary, the entire statutory scheme for assigning beneficiaries and financing the Combined Benefit Fund reflects Congress's intent that all assignments be completed by October 1, 1993. It is not necessary to engage in an exhaustive analysis of the Coal Act to illustrate this point. A look at the interaction of only a few sections is more than sufficient.
 
 
 42
 "Assigned operator" is defined in § 9701(c)(5): "The term 'assigned operator' means, with respect to an eligible beneficiary defined in section 9703(f), the signatory operator to which liability under subchapter B with respect to the beneficiary is assigned under section 9706." Definitionally, then, there are no "assigned operators" until beneficiaries have been assigned under § 9706.
 
 
 43
 The liability of assigned operators is set out in § 9704. Under § 9704(a), the liability of assigned operators for payment of annual premiums is based in part on the "unassigned beneficiaries premium" for which that assigned operator is determined to be responsible under § 9704(d).
 
 
 44
 The "unassigned beneficiaries premium" for which an assigned operator is liable for any plan year, as set out in § 9704(d), is "equal to the applicable percentage of the product of the per beneficiary premium for the plan year multiplied by the number of eligible beneficiaries who are not assigned under section 9706 to any person for such plan year."
 
 
 45
 "Applicable percentage," for purposes of determining the liability of assigned operators, is defined in § 9704(f)(1) to mean "with respect to any assigned operator, the percentage determined by dividing the number of eligible beneficiaries assigned under section 9706 to such operator by the total number of eligible beneficiaries assigned under section 9706 to all such operators (determined on the basis of assignments as of October 1, 1993)."
 
 
 46
 The "applicable percentage" for any assigned operator is subject to annual adjustments for plan years beginning after October 1, 1994. Those adjustments are set out in § 9704(f)(2):In the case of any plan year beginning on or after October 1, 1994, the applicable percentage for any assigned operator shall be redetermined under [ § 9704(f)(1) ] by making the following changes to the assignments as of October 1, 1993:
 
 
 47
 (A) Such assignments shall be modified to reflect any changes during the period beginning October 1, 1993, and ending on the last day of the preceding plan year pursuant to the appeals process under section 9706(f).
 
 
 48
 (B) The total number of assigned eligible beneficiaries shall be reduced by the eligible beneficiaries of assigned operators which (and all related persons with respect to which) had ceased business (within the meaning of section 9701(c)(6)) during the period described in subparagraph (A).
 
 
 49
 In short, the calculation of the obligation of every assigned operator for payment of unassigned beneficiary premiums is dependent upon the completion of the assignment of beneficiaries by October 1, 1993. Furthermore, the statute expressly provides for making adjustments beyond that date, but those adjustments are all premised on the assignments' having been completed before October 1, 1993. This statutory scheme simply is not comparable to that addressed by the Court in Brock v. Pierce County.
 
 
 50
 Neither does the Coal Act present the kind of situation that concerned the Court in Pierce County, namely, a lack of consequences resulting from the agency's failure to act within the timeframe of the statute. See Pierce County, 476 U.S. at 259-60, 106 S.Ct. 1834. Despite the Commissioner's best efforts to make the case that if the October 1, 1993, date is held to be a deadline, there is no consequence contained within the statute for the Commissioner's failure to make the assignments by that date, his argument fails. Beginning on October 1, 1993, there are only two kinds of eligible beneficiaries: those who were assigned to assigned operators pursuant to the provisions of § 9706(a) and those who were not. The consequence flowing from the failure of the Commissioner to make those assignments before October 1, 1993, is clear from the plain language of the statute: the eligible beneficiaries who were not assigned are the unassigned beneficiaries. The premiums that every assigned operator must pay into the Combined Benefits Fund are calculated on the basis of those beneficiaries assigned to it and its aliquot share of the unassigned beneficiaries.
 
 
 51
 By specifying in the statute that "the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree ... to a signatory operator," and by resting the entire scheme for calculation of premiums of the assignments made as of that date, Congress did speak directly and unambiguously on the issue of when the Commissioner's authority to make those assignments expired. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778.
 
 
 52
 We hold that the plain language of the statute is the end of the matter. The attempt of the SSA to create an ambiguity by pointing to the absence of specific language that says "and after October 1, 1993, the Commissioner shall not make any assignments," is misguided. Equally misguided is the attempt of the SSA to create an ambiguity by looking at the legislative history of the Coal Act. Indeed, in this case, as was the case in I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), "[t]he message conveyed by the plain language of the Act is confirmed by an examination of its history." Id. at 432, 107 S.Ct. 1207. We ought not look at the legislative history at all, but if we do, we need look no farther than the Conference Report to confirm that this legislation intended that all assignments of beneficiaries be made before October 1, 1993. While the Commissioner correctly notes that the Conference Report expressly states "[t]he conferees intend that the largest possible number of beneficiaries in the Plans be assigned to a specific or designated company," 138 Cong. Rec. S17,605 (daily ed., Oct. 8, 1992), he neglects to point out that this statement appears in the context of the Report's explanation of the order in which the statute requires that the signatory operators and related persons are to be assigned beneficiaries for whom they may be held responsible. Significantly, the Commissioner also neglects to mention that the statement he quotes is preceded by a lengthy explanation of how the unassigned beneficiary premiums are to be calculated, including this:
 
 
 53
 As a practical matter, not all beneficiaries can be assigned to a specific last signatory operator, related person or assigned operator for payment purposes. This is because in some instances, none of those persons remain in business, even as defined to include non-mining related businesses. Thus, provisions are made for unassigned beneficiary premiums. In each plan year each assigned operator will pay a premium earmarked to cover the health costs of these unassigned beneficiaries.
 
 
 54
 The amount of the unassigned beneficiary premium payable by each assigned operator will be calculated on the basis of the number of beneficiaries assignable to each operator as of October 1, 1993....
 
 
 55
 The first plan year is an eight-month period running from February 1, 1993 through October 1, 1993.... In the first plan year the Secretary of HHS will review the work history of each beneficiary and will prepare the assigned operator allocations which are required to be made by October 1, 1993.
 
 
 56
 Id. (emphasis added).
 
 
 57
 Because the statute is clear and unambiguous, there is no reason even to look to the legislative history. In any event, the legislative history confirms the intent of Congress clearly expressed in the statute. The October 1, 1993 date is a deadline.
 
 
 58
 "[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Where the statute is clear, the agency has nothing to interpret and the court has no agency interpretation to which it may be required to defer. That is the case here. We therefore do not address the Commissioner's arguments with regard to the deference to which he claims the SSA's interpretation of this statute is entitled.
 
 
 59
 Because the statute requires that the SSA make all assignments of beneficiaries before October 1, 1993, it does not permit the SSA to make such assignments after that date. We therefore hold that the district court erred as a matter of law in holding that the SSA's contrary interpretation of the statute was entitled to deference.
 
 IV. CONCLUSION
 
 60
 For the foregoing reasons, we reverse the District Court's order denying Plaintiff's motion for injunctive relief as to all assignments of beneficiaries made after September 30, 1993. We remand this matter to the district court for further proceedings not inconsistent with this opinion with regard to those few assignments to Dixie Fuel that may have been reassignments of beneficiaries initially assigned before October 1, 1993.
 
 
 
 [1]
 A signatory operator is defined by the Act as: "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. § 9701(c)(1)
 
 
 [2]
 A related person is defined as:
 (i) a member of the controlled group of corporations ...; (ii) a trade or business which is under common control ...; or (iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.
 26 U.S.C. § 9701(c)(2)(A). The SSA assigned beneficiaries to Dixie Fuel as a "related person" to V & C Coal, which was not in business at the time the Act was passed. Although Dixie Fuel contested this determination below, it is not relevant to this appeal.
 
 
 [3]
 Essentially, an assignment is made based upon the work history of the miner and the signatory (or related person) and the "in business" status of the miner's employers
 
 
 [4]
 At the Coal Act Hearing in 1995, the Acting SSA Commissioner described the funding sources:
 The Coal Act provides for financial stability of the Combined Benefit Fund by drawing from three constituent sources. First, the beneficiaries themselves were required to participate by the transfer of $210 million from the 1950 Pension Trust in three installments of $70 million in each of the first three plan years. This has been enough to cover the cost of providing benefits to the "unassigned" or orphan beneficiaries in the Combined Fund during these years. (For an additional ten years, transfers from the Abandoned Mine Reclamation Fund are expected to continue to cover this unassigned beneficiary cost).
 Coal Industry Retiree Health Benefit Act of 1992: Hearing on S. 103-59 Before the House Subcomm. on Oversight of the Comm. on Ways and Means, 104th Cong. (1995) [hereinafter 1995 Coal Act Hearing ] (Statement of Acting SSA Comm'r, Lawrence H. Thompson). Currently, assigned operators have not been assessed any unassigned beneficiary premiums because the other two sources have been sufficient to provide benefits. Id. (Testimony of UMWA Combined Fund Executive Dir. Russell U. Crosby).
 
 
 [5]
 Dixie Fuel's challenge to the assignment to it of beneficiaries initially assigned to another assigned operator is not the subject of this appeal
 
 
 [6]
 The district court entertained oral argument on Dixie Fuel's motion for a temporary restraining order, after which, at the court's request, the parties filed additional briefs on the issue of whether the October 1, 1993, date in 26 U.S.C. § 9706(a) was the deadline for assigning of beneficiaries. Although the district court's subsequent order states that "plaintiff's motion for a temporary restraining order, preliminary and permanent injunction is denied," the order also states that "[a]t this point in time the court cannot find that the plaintiff will succeed on the merits of its case," and that "injunctive relief is not appropriate at this time."
 
 
 [7]
 As we shall discuss more fully later in this opinion, the statute actually says that the assignments shall be made "before October 1, 1993." 26 U.S.C. § 9706(a). This would mean, of course, that no assignments could be made after September 30, 1993. Solely in order to avoid confusion, we will use the October 1, 1993, designation throughout this opinion
 
 
 [8]
 See 5 U.S.C. § 701(a), which provides "[t]his chapter applies, according to the provisions thereof, except to the extent that--(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law;" and 5 U.S.C. § 702, which in pertinent part provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."
 
 
 [9]
 Section 704 provides, in pertinent part: "Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."
 
 
 [10]
 Pierce County involved a provision in the Comprehensive Employment and Training Act ("CETA"), an act which required qualified entities receiving federal grants for job training programs to comply with the statute and regulations enacted thereunder. Pierce County, 476 U.S. at 255, 106 S.Ct. 1834. CETA provided that the Secretary of Labor was to investigate whenever he has reason to believe that a grant recipient was misusing grant funds, and further provided that the Secretary "shall" determine "the truth of the allegation or belief involved, not later than 120 days after receiving the complaint." Id. at 255-56, 106 S.Ct. 1834
 The Secretary withheld a portion of Pierce County's grant funds after the 120 days had expired and Pierce County challenged the Secretary's authority to do so, arguing that the statute divested the Secretary of authority after the specified time period. Id. at 256-57, 106 S.Ct. 1834. The Supreme Court found that use of the word "shall," standing alone and in the face of a contrary indication from the rest of the statute, was insufficient to remove the Secretary's power to act after 120 days. Id. at 262, 106 S.Ct. 1834.